ON MOTION FOR REHEARING

GRAVES, Presiding Justice,
for the Court.
PART ONE
¶ 1. The appellant’s motion for rehearing is granted. The previous opinions are withdrawn and these opinions are substituted therefor.
¶ 2. Anthony Joe Doss was convicted of capital murder in the Circuit Court of Grenada County and sentenced to death for the murder of Robert C. Bell. Doss’ conviction and sentence were affirmed by this Court on direct appeal. Doss v. State, 709 So.2d 369 (Miss.1996), cert. denied, 523 U.S. 1111, 118 S.Ct. 1684, 140 L.Ed.2d 821 (1998). In Doss v. State, 882 So.2d 176 (Miss.2004), this Court granted Doss’ Application for Leave to File a Motion to Vacate Judgment and Sentence, finding that Doss was entitled to an evidentiary hearing in the trial court on the issues of whether he received ineffective assistance of counsel during the penalty phase and whether he was mentally retarded. The trial court considered the evidence and found against Doss on both issues. Doss subsequently filed this appeal. This Court reverses the trial court’s denial of post-conviction relief on the issue of ineffective assistance of counsel and remands this matter to the trial court for further proceedings consistent with this opinion.
PROCEDURAL HISTORY
¶ 3. Doss was convicted of capital murder in the Circuit Court of Grenada County and sentenced to death for the murder of Robert C. Bell. Doss’ conviction and sentence were affirmed by this Court on direct appeal. Doss v. State, 709 So.2d 369 (Miss.1996), cert. denied, 523 U.S. 1111, 118 S.Ct. 1684, 140 L.Ed.2d 821 (1998). Doss filed an Application for Leave to File Motion to Vacate Judgment of Sentence in this Court in May 2003. This Court granted Doss leave to proceed in the trial court on the following issues: (1) Whether he was mentally retarded; and (2) whether his trial counsel had been ineffective at the penalty phase. Doss v. State, 882 So.2d 176 (Miss.2004).
*694 ¶ 4. The Grenada County Circuit Court held an evidentiary hearing on this matter on September 6-7, 2006. Doss presented the following witnesses: Dr. Criss Lott, a psychologist; Lee Bailey, Doss’ trial counsel; Dr. Daniel Grant, a psychologist; Dr. Timothy Summers, a psychiatrist; Q.T. Doss, Doss’ cousin; Sadie Doss, Doss’ mother; Sandra Price, a daughter of Sam “Joe” Brown, with whom Sadie Doss had lived in Chicago; and Sam Henry Phillips, Doss’ biological father. The State presented Dr. Gilbert V. MacVaugh, III, a psychologist, and Dr. Reb McMichael, a psychiatrist, as witnesses. On December 12, 2006, the trial court entered an Order and an Opinion, finding that Doss was not mentally retarded and that he was not denied effective assistance of counsel. Doss’ Motion to Alter or Amend Opinion and Judgment was denied. Subsequently, Doss filed this appeal, asserting that he did not receive effective assistance of counsel at the sentencing phase of his trial and that the decision in Atkins v. Virginia requires that the death sentence in this case be set aside. Atkins, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
ANALYSIS
¶ 5. The standard of review after an evidentiary hearing in post-eonvietion-relief (PCR) cases is well settled. This Court has said:
“When reviewing a lower court’s decision to deny a petition for post conviction relief this Court will not disturb the trial court’s factual findings unless they are found to be clearly erroneous.” Brown v. State, 731 So.2d 595, 598 (Miss.1999) (citing Bank of Mississippi v. Southern Mem’l Park, Inc., 677 So.2d 186, 191 (Miss.1996)) (emphasis added). In making that determination, “[t]his Court must examine the entire record and accept ‘that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court’s findings of fact....’” Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss.1987) (quoting Cotton v. McConnell, 435 So.2d 683, 685 (Miss.1983)). That includes deference to the circuit judge as the “sole authority for determining credibility of the witnesses.” Mullins, 515 So.2d at 1189 (citing Hall v. State ex rel. Waller, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963)).
Loden v. State, 971 So.2d 548, 572-573 (Miss.2007). However, “where questions of law are raised the applicable standard of review is de novo.” Brown v. State, 731 So.2d 595, 598 (Miss.1999) (citing Bank of Mississippi v. Southern Mem’l Park, Inc., 677 So.2d 186, 191 (Miss.1996)). The burden of proof at an evidentiary hearing on a PCR case is on the petitioner to show “by a preponderance of the evidence” that he is entitled to relief. Miss.Code Ann. § 99-39-23(7) (Rev.2007).
I. WHETHER DOSS RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE SENTENCING PHASE OF HIS TRIAL.
¶ 6. Doss asserts that defense counsel, Lee Bailey, failed to properly investigate the available mitigating evidence and presented only one witness in mitigation at the penalty phase.
¶ 7. The United States Supreme Court established a two-part test for determining a claim of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as follows:
First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed *695 the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Id. at 687, 104 S.Ct. 2052.
¶ 8. The Court further established that “[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.” Id. at 688, 104 S.Ct. 2052. “The defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694, 104 S.Ct. 2052. With regard to an attorney’s duty to investigate, the Court said the following in Strickland:
These standards require no special amplification in order to define counsel’s duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgment.
Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052.
¶ 9. This Court has applied the Strickland standard numerous times and has further said, “an attorney’s lapse must be viewed in light of the nature and seriousness of the charges and the potential penalty.” See Ross v. State, 954 So.2d 968, 1004 (Miss.2007) (citing State v. Tokman, 564 So.2d 1339, 1343 (Miss.1990)). In Ross, defense counsel offered, as mitigating evidence during the sentencing phase, the testimony of Ross’ mother, grandmother, and daughter, a minister from the jail, and a sheriff who had arrested Ross. The testimony referenced Ross’ character, and the witnesses described Ross as a “good prisoner.” Id. at 1005. Counsel’s failure to investigate Ross’ inmate record led to the admission of highly prejudicial evidence on cross-examination. Ross’ counsel also failed to conduct an adequate investigation into potentially mitigating factors, including Ross’ psychological problems, and failed to obtain an expert to testify to these factors. This Court noted:
While courts must defer to lawyers’ judgments and strategies, “at a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case.” Ferguson v. State, 507 So.2d 94, 96 (Miss.1987). Under this standard, counsel may be deemed ineffective for relying almost exclusively on material furnished by the State during discovery and conducting no independent investigation. Id. While counsel is not required to exhaust every conceivable avenue of investigation, he or she must at least conduct sufficient investigation to make an informed evaluation about potential defenses. State v. Tokman, 564 So.2d at 1343.
Ross, 954 So.2d at 1005. This Court further said:
[Cjounsel will not be deemed ineffective if there is proof of investigation or if *696 there is no factual basis for the defendant’s claim. However, each of these principles presuppose a certain level of investigation. By contrast, “strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a large body of mitigating evidence.” ... “It is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover.”
Ross, 954 So.2d at 1006 (citation omitted).
¶ 10. In his application for leave filed with this Court in 2003, Doss relied on affidavits[1] from several people with various connections to him, including: Lee Bailey, trial attorney; Kelvin Winbush, Bailey’s investigator; Carolyn Watkins, the public defender who handled a separate murder charge against Doss in Shelby County, Tennessee; Sadie Doss, mother; Verlene Forest Williams, friend; Carolyn Phillips, aunt; Ernestine Williams, aunt; Lucretia Monger, sister; Randy Doss, brother; Roselyn Monette Jackson, aunt; Mary Jennings, aunt; John Westmoreland, formerly married to an aunt; Annette James, girlfriend; Marvin Doss, half-brother; Q.T. Doss, cousin; Lillie Moore, aunt; Sandra Price, daughter of Sam “Joe” Brown, who lived with Doss’ mother in Chicago; Chantay Price, Sandra Price’s sixteen-year-old daughter; Varnado McDonald, step-sister of Lucretia Monger; Carrie Cole, aunt; Rosie Caldwell, Mend of Doss’ mother; and Sam Phillips, biological father.
¶ 11. With regard to the affidavit of defense counsel Lee Bailey, this Court summarized:
Doss relies first on the affidavit of his trial attorney who states that: Doss’ was the first case he had defended where the death penalty was sought; he did not seek any school, medical, mental health or other records, because he did not realize the importance of the records in presenting a defense during the sentencing phase; he did not seek advice from a mental health expert, funds for a mental health expert or any kind of mental health evaluation; and he did not obtain any records resulting from the investigation of criminal charges against Doss in Shelby County, but he did obtain the indictment and judgment in that case. Bailey also obtained the appointment of an investigator, Kelvin Winbush, who was also the investigator for Doss’ co-defendant, Frederick Bell. Bailey stated that Winbush told him he had interviewed: Doss’ aunt, Lillie Moore, Doss’ sisters, Lucretia Monger and Mavis McCaster; Doss’ brothers, Marvin Doss and Randy Doss; and John Westmore-land and that all stated that Doss was a good and/or quiet person who got involved with the wrong crowd. Bailey did not follow up with these witnesses or ask them to testify at the sentencing phase. Bailey stated that Winbush told him he had contacted two teachers in Bruce, a Mrs. Parker and a Coach Smith, but it was questionable as to *697 whether these people actually knew Doss, or whether they had mistaken him for Frederick Bell. Bailey did not realize that a conflict might result from using Winbush, where one of Bailey’s potential defense strategies was to blame Bell as the instigator of the shooting. Bailey states that he interviewed only Doss’ mother and an aunt for a few minutes. Bailey states that he felt he did a good job in defending the case at the guilt phase, but that he did not know what he was doing as to the sentencing phase.
Doss, 882 So.2d at 186.
¶ 12. As to the affidavit of investigator Kelvin Winbush, this Court said:
Kelvin Winbush’s affidavit states that this was his first mitigation investigation, and that he was also the investigator for Frederick Bell. Winbush identified Lillie Moore, Lucretia Monger, Mavis McCaster, Marvin Doss, Randy Doss, and John Westmoreland, a friend, as favorable mitigation witnesses. Win-bush also identified Coach Smith, a teacher and coach in Bruce, as someone who knew Anthony and said he “behaved fairly well for the most part.” Winbush stated that he gave Bailey contact information for some of the witnesses, and Bailey knew Winbush had contact information for them all. Win-bush says that he was never asked to follow up with the witnesses, to arrange for subpoenas, to arrange for their presence at trial, or to look for additional witnesses after Winbush’s initial report. He was also not asked to do any investigating in Chicago.

Id.

¶ 13. Carolyn Watkins, public defender in Shelby County, “states in an affidavit that she obtained school records for Doss from Chicago; Doss’ medical records from Chicago, including records involving a 1986 head injury; and the 1988 psychological report done at the University of Mississippi. She states that Lee Bailey never requested these records.” Id.
¶ 14. As to the remaining affidavits, this Court characterized them as follows:
The affiants say that Doss was shy and quiet, not a violent person; that there were times when Doss seemed to go into a seizure or trance of some kind, when he did not respond to people; that he had mental or medical problems that began with his mother’s drinking and drug use during her pregnancy with him, followed by lead poisoning and head injuries during Doss’ childhood; that mental illness seemed to run in the Doss family; that Doss was easily led by Frederick Bell, who was a bad, violent person and came from a violent family; that Doss began to run with a bad crowd when he moved from Chicago to Mississippi; that Doss’ birth and upbringing in Chicago were riddled with crime, drug abuse and poverty. Specifically mentioned and blamed for much of the misfortune suffered by Doss and his family in Chicago was Sam Brown, who lived with Doss’ mother. Doss apparently believed for much of his early life that Sam Brown was his biological father. According to various affidavits, Sam Brown was violent and abusive toward Doss, his mother and the rest of the family; he took what little money the family had to buy drugs and gamble; and he sold drugs and introduced the children in the family to drugs.
Doss, 882 So.2d at 187.
¶ 15. In finding that Doss should have the opportunity to present evidence to the trial court in support of his claim that counsel’s failure to investigate and present available mitigation evidence constituted ineffective assistance of counsel, this Court said:
*698 We acknowledge that many discrepancies exist among the affidavits presented by Doss in support of this issue. However, we conclude that Doss has made a sufficient showing under the Strickland test that Bailey’s efforts fell short of the efforts a counsel should make in a death penalty sentencing trial, so as to entitle Doss to an evidentiary hearing on this claim in the circuit court. This was Bailey’s first death penalty case, and he admitted that he did not know what he was doing in the sentencing phase. When counsel makes choices of which witnesses to use or not use, those choices must be made based on counsel’s proper investigation. Counsel’s minimum duty is to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case.
Id. at 189.
¶ 16. The trial court held a PCR evi-dentiary hearing in 2006 and heard testimony from Lee Bailey, Q.T. Doss, Sadie Doss, Sandra Price and Sam Phillips. On December 12, 2006, the trial court issued an opinion, finding that Doss had not received ineffective assistance of counsel. We find the trial court’s findings to be clearly erroneous.
¶ 17. Doss’ application for leave to this Court included, as an exhibit, an affidavit from Bailey, which stated, in relevant part:
3. Prior to this, I had never represented a defendant in a capital murder case where the death penalty was sought.
4. I did not seek or obtain any school, medical, mental health, or other records regarding Mr. Doss. This was not for any strategic reasons. I did not realize the importance of obtaining such records in order to prepare for the sentencing phase of a capital case.
5. I knew the defendant, Mr. Doss, had grown up in Chicago and had gone to elementary school and into the beginning of high school there. I was aware that Mr. Doss had been in special education classes in Chicago and also suffered from blackouts and headaches. However, I did not understand the significance of this and did not seek any advice from a mental health expert. Also, I did not request funds for a mental health expert or any type of mental health evaluation. This was not for any strategic reason.
6. I did not obtain any records from the investigation done in Memphis by Mr. Doss’ attorney there. However, I did obtain the indictment and judgment in that case.
[[Image here]]
9. I did not ask Mr. Winbush [investigator who provided statements and contact information for several potential witnesses to Bailey] to follow up with any of these potential witnesses, or with anyone else, and I did not follow up with them myself to obtain more information or to determine for myself whether they would be helpful witnesses. I did not ask any of them to testify at the sentencing phase. This was not for any particular strategic reason.
10. Other than the family members just mentioned and Mr. Westmoreland [possible witness who knew Doss], the only other specific individuals Mr. Win-bush identified that he had talked to were two teachers in Bruce, Mississippi, Mrs. Parker and someone he identified only as “Coach Smith.” But it was Freddie Bell who had gone to school in Bruce, not Mr. Doss, who lived in Calhoun City. Indeed, Mr. Winbush told me that Mrs. Parker had only taught Mr. Bell, not Mr. Doss. Mr. Winbush said that “Coach Smith” knew Mr. Doss and *699 that Mr. Doss had behaved well around him. He never explained how Coach Smith knew Mr. Doss. I did not ask Mr. Winbush to go back for clarification, or to go back and try to find others who might know Mr. Doss as opposed to Mr. Bell, including those who lived in Calhoun City where Mr. Doss presently lived. I did not do this investigation myself and did not try to contact Coach Smith myself. .
11. Although I knew Mr. Winbush was working as the investigator for Mr. Bell, I did not consider at the time how-this posed a conflict of interest.' I was not particularly focused on obtaining evidence for the sentencing phase to show that Mr. Bell was the more culpable of the two, and that he had dominated Mr. Doss and led him into these misdeeds. Had I been focused on that, I might have realized the conflict and sought another investigator.
12. To the extent that Mr. Winbush claimed that he spent 100-120 hours investigating this case, I do not believe this is accurate. Even if you include the time he spent driving and looking for people, I do not think he spent that much time.
13. I did not do any mitigation investigation in Chicago, where Mr. Doss grew up and lived most of his life, and I did not ask Mr. Winbush to do so. I did not contact any witnesses or family members there. I did not seek funds from the Court for such an investigation. This was not for any strategic reason.
14. My time records show that the only family members or friends who I interviewed were the defendant’s mother, who was the only witness I presented at the punishment phase, and one of the defendant’s aunts, who I did not call as a witness. The discussion with them lasted only a few minutes according to my records. I did talk again with the defendant’s mother during the trial, and prior to her testimony, I discussed the possible testimony with her. However, this discussion was not lengthy and I did not spend much time interviewing her or preparing her to take the stand.
15. The omissions that I have mentioned in this affidavit with respect to the mitigation investigation were not motivated by any particular strategic reason. Although I believe I did a good job in defending this case at the guilt phase, I had never handled a punishment phase in a capital case before. It is' unjike anything I have ever done. There’s no other proceeding that I have ever been involved in where the jury decides the punishment, and of course, none where the stakes were this high. My omissions in the punishment phase in this case were due, I believe, to my inexperience in this particular type of proceeding. Looking back on it, I believe now that I provided a good defense at the guilt phase, but that I failed to undertake the essential functions of properly and thoroughly investigating mitigation and presenting a defense at the penalty phase.
16. If I failed to make any objections during the trial that should have been made, that was not the result of any strategy decisions.
Lee Bailey Aff. (Aug. 23, 2001).
¶ 18. After the PCR hearing, the trial court found that the “testimony of Lee Bailey was in sharp contrast with the information that was contained in the affidavit” submitted to this Court, but that Bailey was not trying to mislead, because he did not have access to his case file when he signed the affidavit and was “relying on his memory of events that had taken place over eight years earlier.” The trial court also noted that Bailey believed he had not *700 obtained records from Carolyn Watkins, Doss’ public defender in Memphis, when he signed the affidavit, but then realized two days before trial that he had actually gotten some of these records.
¶ 19. The trial court’s reasoning was incorrect. Bailey’s inability to remember that he had actually obtained these records could not have been because he did not have access to his file. Bailey admitted during redirect examination that the file was available any time he requested it and that McDuff, Doss’ present counsel, went so far as to offer to drive the file to Bailey. Also, the following exchange occurred between McDuff and Bailey during the hearing:
Q. Was there ever a time that you asked me to look at that file that I didn’t get it to you within a few days?
A. No.
Q. Okay.
A. Now, there was — there was something he asked awhile ago about meeting halfway in Jackson. I remember something about that. But no, you’ve always been cordial. You always — whenever I wanted something, you had it right there.
¶ 20. Moreover, the portion of the file containing the records that Bailey found two days before trial was not even included in the file that was given to McDuff, but rather was found in a storage box in Bailey’s office. Specifically, Bailey testified during direct examination in the PCR hearing:
A. I got some records from Memphis. I think that Caroline Watson [sic] either had them sent to me by someone else or she sent them to me. I don’t know, but I got them in my possession. And they weren’t in the regular file.
[[Image here]]
Q. Okay. And, and where did you find them?
A. In an old file of mine, a big box that I had old criminal files stored away in. I found them in there.
Q. Were they in a particular file folder that was labeled?
A. No.
¶21. Bailey further testified that the documents that he discovered two days before the PCR hearing included records from North Mississippi Medical Center, Shelby County government (from Joyce King, legal investigator), Bethany Hospital in Chicago, and a psychological report from the University of Mississippi. Bailey also acknowledged that some of the reports were missing multiple pages and he had never obtained complete copies. Moreover, with the exception of the “forgotten” records, the remainder of Bailey’s testimony at the PCR hearing verified his sworn statements in the affidavit, for example:
Q. And prior to you signing that affidavit you and I — prior to any affidavit being drafted you and I talked about this case, didn’t we? I came to your office and we talked.
A. Sure. Sure.
Q. And then I drafted an affidavit, and I brought it back to you. And you and I went over it line-by-line, didn’t we?
A. Sure.
Q. And you told me that everything in there that you signed in the file [sic] version was true, didn’t you?
A. Sure.
Q. You signed it under oath, didn’t you?
A. Sure.
Q. Now, did you lie in that affidavit?
A. I didn’t remember about those files that I got from Caroline Watson [sic].
*701 Q. Right. You thought you had not requested those.
A. I didn’t think I had those.
Q. Is there any place other than that where you said something — you believed it was true at the time. Was there any place where you said something you didn’t believe was true?
A. No. No. Paragraph 5, about him growing up in Chicago. Yeah. That’s true. Having black-outs. Yeah. I didn’t seek a medical health expert. That’s true. I didn’t think that Winbush was a conflict of interest. You know, that’s true. I didn’t ask him to follow up on any of these witnesses. That’s true.
But now, not being particularly focused on the sentencing hearing, some things have been said in here today that leads me to think that yeah, I was trying to get some witnesses for the sentencing. But as far as I was concerned and having as little experience as I had, which was absolutely none, I didn’t see that there were any witnesses other than what we had.
Q. And do you recall that when you and I talked about this case, I had your file with me, brought it to Grenada prior to you signing the affidavit so you could go through it?
A. Brought it to Winona.
Q. I mean to Winona. I’m sorry.
A. Yes. You brought it to Winona. Yes.
Q. You had it there prior to signing the affidavit.
A. You talking about five years ago?
Q. Yeah.
A. I don’t remember that. I just know — I know that you came up and came up fairly often I thought. You were really diligent, but I don’t — I just remember signing the affidavit.
In fact, I didn’t even remember what was in it. When Doug Evans [prosecutor] was asking me about it, I said I signed an affidavit. I don’t remember what it was. But, you know, memory— memory is slipping a little.
Q. Right. Are you able to say at this point — I want to make this clear. Are you saying at this point that we did not go through the file prior to you signing that?
A. No, I am not saying that. You went through everything thoroughly.
Q. And in Paragraphs 4 and 6 about the records, as soon as you found those records you told me; right?
A. Right.
¶ 22. The trial court further found that Doss and his mother were not “forthcoming with many witnesses who could offer testimony that would be favorable to Anthony,” and that Bailey was given the name of Derma Police Chief Mark Hendrix, but chose not to call him because of an unfavorable ruling on a motion in li-mine.[2] Specifically, the trial court found that “[t]his shows that Bailey made an effort to locate any witnesses that Anthony believed could offer testimony that would be favorable to him.” The trial court said:
This court during the evidentiary hearing heard many tales of woe concerning the environment in which Anthony was reared, including an abusive father/stepfather and an indifferent and alcoholic mother. However, this information was not provided to Bailey during his representation of Doss. Sadie testified that she did not share the information concerning Anthony with Bailey. She stated that only after getting to *702 know McDuff and thinking of him as a brother, did she share information with McDuff concerning the details of her life and of Anthony’s upbringing.
This court does not believe that the failure of Bailey to learn the sordid details of the life of Sadie Doss and of Anthony, in any way indicates that Bailey was ineffective. He was relying on Sadie and Anthony to provide information about Anthony’s life and of potential witnesses that could testify favorably about Anthony. If those two did not provide that information to Bailey, he is not to blame for their lack of forthrightness. Only from them, could he have learned the names of Q.T. Doss, Sam Phillips, Sandra Price, or the individuals that submitted affidavits to the Mississippi Supreme Court, but did not testify at the hearing.
Op’n, Circuit Court of Grenada County, at pp. 9-10 (Dec. 12, 2006).
¶ 23. The trial court said that Sadie had failed to provide certain information to the University of Mississippi during an unrelated proceeding in 1988 and during a brief discussion with Bailey in 1993, saying:
This court will not speculate as to whether she failed to provide this information to the University of Mississippi and to Bailey due to embarrassment, or whether much of her testimony in the evidentiary hearing was a figment of her imagination due to too many years of drinking Crown Royal and beer, or whether her testimony is laced with perjury [n. 4] and exaggeration in an attempt to free Anthony from death row. However, this court is of the opinion that Bailey did the best he could with the 1993 version of the truth that was provided by Sadie.
n4 She either perjured herself in Anthony’s original trial or at the evi-dentiary hearing. At the trial, she testified that Sam Brown was Anthony’s father. Now she claims his father is Sam Phillips.
Op’n at p. 11.
¶ 24. However, the trial court’s findings are contradicted by the record in this matter. The record establishes that Bailey spoke only briefly to Sadie by telephone and never met with her in person prior to Doss’ trial in 1993. Further, during the sentencing phase of Doss’ trial, Bailey failed to ask a single question that would evoke any “sordid details of the life of Sadie and Anthony” or that would evoke any “tales of woe” about abuse as stated by the trial court. The relevant portions of Sadie’s testimony on direct examination by Bailey from 1993 are as follows:
Q. Now, where was Anthony born?
A. Chicago.
Q. And, who is his father?
A. Sam Brown.
Q. Is Sam here today?
A. No, he’s not. He don’t know anything about it.
[[Image here]]
A. He’s not here. He don’t know anything about it. I got — I tried to get in touch with him, but I couldn’t.
Q. And, are you and Sam married?
A. No, we not; common law.
Q. How long did Anthony live in Chicago?
A. I think 16 years, if I’m not mistaken. 15 or 16 years.
Q. And, then where did he move to?
A. Calhoun City.
Q. And, he’s been living there with you?
A. Yes.
Q. Did he go to school there?
A. A period of time.
Q. How long?
*703 A. I really don’t know. I think about a couple of months.
Q. What grade has Anthony completed in school?
A. It was ’twixt [sic] the 9th and the 10th.
Q. Has he been working?
A. No. He went to look for a job. They say he’s too short and too young.
[[Image here]]
Q. Do you have any other relatives that live there with you?
A. Talking about in Calhoun City?
Q. Uh-huh. (Affirmative.)
A. When Anthony was with me?
Q. Uh-huh. (Affirmative.)
A. Yes, I did.
Q. How many?
A. One.
Q. And, what kind of home did you have?
A. Beautiful home. One more thing. You say who all stayed. My other — I have one daughter stayed with me, period.
Q. Now, do you work?
A. No, I don’t. I been sick.
Q. Huh?
A. I’m sick.
Q. How long you been sick?
A. For 20-something years.
Q. Now, what kind of income does your family have? When Anthony was living there with you?
A. I was on welfare at the time.
[[Image here]]
Q. And, he didn’t graduate from high school?
A. Only from the 8th.
Q. Now, you know Anthony. Would you tell us how — what kind of person is Anthony?
A. Anthony was a warm, beautiful person, and he alway [sic] at home with me, and when I was sick he always would get up and he try to fix me food. Sometimes I can’t walk. The arthritis have me sometimes. Like today, I may be able to walk just as straight as any of y’all and then the next couple of days, I may not can walk. I have to walk with a crutch. And, he would do for me. He always said, “Mama, I want to get a job, where I can take care of you.” And, Anthony also was playing ball one day and this — a man came through the alley and hit him on the head and busted his head, and I took him to the doctor. He had a concussion. So, Anthony was very good. And, after that he started having headaches, and I took him to the doctor.
Q. When was this that he got hit in the head?
A. It was when he was about 11. And he also got hit in the head when he was about 17, I think. At 17 he got hit in the head again.
Q. Now, when you say hit in the head, are you talking serious?
A. Yes.
Q. All right, hospital?
A. I took him to the hospital and they release him, and he also was hit again and he was taken to the hospital, and they sent me a statement from Chicago — from the hospital— that — I don’t have the papers now— that his hand was hurt and his head was busted.
Q. All right, now, when he got hit in the head these times did you notice any change in Anthony?
A. He would have headaches. Some days he won’t say nothing. Then, *704 the next day, he talk. But, he didn’t bother nobody.
¶ 25. Clearly, counsel was aware of Doss’ head injuries, yet failed to investigate the details behind these injuries or to present any other evidence during the sentencing phase regarding the extent of the injuries and any long term or permanent damage — despite portions of the hospital records and various psychological evaluation reports being provided to Bailey by the public defender’s office in Shelby County.[3] If counsel had inquired further into Doss’ injuries, counsel easily would have obtained the names of potential witnesses such as Sandra Price, whom the record reveals was raped during the same home invasion when Doss was beaten with a pipe. If counsel had reviewed the records in his possession, he also would have discovered other possible witnesses, including Doss’ brothers and sisters. Also, counsel appeared surprised at Sadie’s statement that she had been sick. Counsel failed to ask a single question about whether Doss had ever been abused, what kind of environment he had been exposed to in Chicago, how he did in school, whether he was in special education classes, or anything else that could have been mitigating. Counsel merely asked what kind of home Sadie had in Mississippi, not Chicago, and what kind of person Doss was, without delving into any other relevant evidence. The duty of reasonable investigation rests squarely on counsel’s shoulders. There is nothing in the record to establish that counsel undertook a reasonable investigation.
¶ 26. During the PCR hearing, Sadie Doss testified that Sam Brown is the father of her other son, Randy Doss, and that she was living with Sam Brown at the time she became pregnant with Anthony. Sadie testified that Sam Phillips is actually Doss’ biological father, but that Doss was told his father was Sam Brown and that she felt Sam Brown was his father because he helped raise Doss. Sadie further testified that the family suffered violent abuse at the hands of Sam Brown, who Doss believed was his father for several years and with whom they lived until Doss was approximately fifteen years old. Sadie testified that she drank heavily during her pregnancy with Doss, that Sam Brown beat her so violently that she began bleeding and almost suffered a miscarriage, that Sam Brown infected her with gonorrhea while she was pregnant, and that she took the medication Valium while she was pregnant. In addition, Sadie testified that Doss had lead poisoning as a child; that he had witnessed Sam Brown beating her; that he was beaten and abused by Sam Brown; that Sam Brown had abused drugs and spent the family’s money on drugs; that the family had lived in a very poor, bad, drug-infested neighborhood where gangs were prevalent in Chicago;[4] and provided various other relevant evidence that trial counsel failed to even inquire about during the sentencing phase of Doss’ original trial.
*705 ¶ 27. With regard to personal information that was not reported during the interview at the University of Mississippi in 1988 stemming from an unrelated youth court matter, Sadie testified as follows:
Q. Okay. Now, these sorts of things, the things that — the infection you got, the beatings while you were pregnant, the beatings while you were with Sam Brown, are those things you would — you would tell strangers?
A. No.
Q. Would you tell many people about those things?
A. No.
Q. Why not?
A. It would hurt me, and people laugh. I had told someone, and they laughed about it.
Q. Do you — do you ever remember taking Anthony to be seen by a psychologist over in Oxford?
A. Yes.
Q. Okay. Do you remember them asking you about your pregnancy?
A. No, I don’t.
[[Image here]]
Q. Miss Doss, you said you didn’t tell many people about this. Why did you tell me?
A. Well, y’all were just so comfort [sic]. Just like he was my own family, and I would talk to y’all. Just something there about you was just like family, and I don’t tell everybody.
Q. Did you and I spend a lot of time together?
A. Yeah.
Q. Did you feel like you got to know me?
A. Yes, I did. Just like if you was a brother.
Q. Did I explain this might be important for Anthony’s case?
A. Yes.
Q. Did I ask you to make up anything? A. No.
Q. Did I ask you to say something that wasn’t true?
A. No.
[[Image here]]
Q. Did Lee Bailey ask you about any of these private — would he ask you any of these questions about private details, the lawyer, Anthony’s trial lawyer?
A. No, he did not.
Q. Okay. Did you feel like you got to know Mr. Bailey very well?
A. No, I did not.
¶ 28. Also, testimony was offered by psychological experts during the PCR hearing as to why Sadie initially may not have provided this information. During direct examination of court-appointed expert Dr. Criss Lott, counsel for Doss asked Lott whether it was necessary to spend time with people to get them to discuss private matters. Lott answered: “That varies. I think some people may be very open. Some people certainly may be reluctant. In the custody evaluations I do, I rarely get information from people. They don’t want to get involved. No matter how many times I try to contact someone like that, I may never get any information.” Further, during cross examination of Lott, the State elicited as follows:
Q. Yeah. But, but you are — you have to rely on this sort of stuff and the validity of those things. Do you find it interesting that the problems that Miss Doss decided she had after the conviction, much longer after he was convicted and sentenced to death, are not the same ones she had when she was having him *706 treated in 1988 at the — or interviewed or assessed at Ole Miss or at Tupelo?
MR. MCDUFF: I am going to object to that evidence. It makes a characterization that is not supported by the evidence or in the evidence.
THE COURT: I’ll overrule the objection.
A. Mr. White, the evaluation that was done in '88 by the University of Mississippi was a youth court evaluation which was looking, assessing Mr. Doss at that time prior to going to possibly training school. It was not what I would consider to be a comprehensive evaluation and certainly not a comprehensive forensic evaluation. I do those evaluations too, the youth court. And my report would not be as exhaustive and I would ask the mother about substance abuse history but a lot of times they may be minimizing that, because it is not something that they want to own up to at that point.
So it’s — I see it. I see that occasionally, that people — in terms of the context that if I’m trying to get an evaluation for a child as to whether or not they should get mental health treatment and go to Oakley. I don’t always get all the data from the parents.
And I’ll evaluate the parent, but they may not tell me everything at that time. So it’s — I see that and I understand your concern here. But for me it hasn’t been that unusual, not to get all the data in certain cases.
¶ 29. Dr. Timothy Summers also testified about this:
Q. In obtaining information that a person might consider private or embarrassing, is it important for the psychologist or psychiatrist, whoever is interviewing them, to take their time with that person to explain?
A. Yes.
Q. Explain why this private, perhaps embarrassing, information is being sought.
A. Yes.
Q. Dr. Lott testified earlier about the difference between the cursory evaluation and more extensive forensic evaluation. Is it possible that a cursory evaluation, like a youth court evaluation, a person might not reveal embarrassing information but then later might do so once they are approached and the importance is explained to them of talking about private details?
A. Yes.
Again, there is nothing in the record to indicate Bailey ever asked Sadie any questions that would elicit this evidence. Moreover, even if neither Doss nor Sadie had provided any mitigating evidence, Bailey still would not have been relieved of his duty to investigate. See Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (“[E]ven when a capital defendant’s family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase....”) In Rompilla, the evidence in mitigation included the brief testimony of five of Rompilla’s family members arguing for residual doubt, asking for mercy, and saying that Rompilla was innocent and a good man. On PCR, Rompilla raised ineffective assistance of counsel for failure to present significant mitigating evidence about his childhood, mental capacity and health, and alcoholism. The trial court denied relief, and the Pennsylvania Supreme Court affirmed. Rompilla then petitioned for a writ of habeas corpus in federal district court, which found, in relevant part, that counsel had failed to inves *707 tigate “pretty obvious signs” of Rompilla’s troubled childhood and his mental illness and alcoholism, “and instead had relied unjustifiably on Rompilla’s own description of an unexceptional background.” Rompilla, 545 U.S. at 379, 125 S.Ct. 2456. The Third Circuit Court of Appeals reversed, finding in part that counsel had attempted to uncover mitigation evidence by interviewing Rompilla and family members and by consulting with three mental health experts. After granting certiorari, the United States Supreme Court reversed, noting that this “case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel’s job is to counter the State’s evidence of aggravated culpability with evidence in mitigation.” Id. at 380-81, 125 S.Ct. 2456. Applying a standard of reasonableness, the Court addressed the minimal contributions of Rompilla and his family members to any mitigation case and the lack of useful information provided by the mental health reports. The Court also said:
When new counsel entered the case to raise Rompilla’s postconviction claims, however, they identified a number of likely avenues the trial lawyers could fruitfully have followed in building a mitigation case. School records are one example, which trial counsel never examined in spite of the professed unfamiliarity of the several family members with Rompilla’s childhood, and despite counsel’s knowledge that Rompilla left school after the ninth grade.... Other examples are records of Rompilla’s juvenile and adult incarcerations, which counsel did not consult, although they were aware of their client’s criminal record. And while counsel knew from police reports provided in pretrial discovery that Rompilla had been drinking heavily at the time of his offense, ..., and although one of the mental health experts reported that Rompilla’s troubles with alcohol merited further investigation, ..., counsel did not look for evidence of a history of dependence on alcohol that might have extenuating significance.
Rompilla, 545 U.S. at 382, 125 S.Ct. 2456 (citations omitted).
¶ 30. In the instant case, Bailey somehow obtained the records from the separate action in Memphis, although he was unclear on how exactly that came about, but there is no evidence he ever actually reviewed the records, which would have opened up several possible mitigation leads. These reports included information that Doss: drank alcohol regularly and had started drinking at age eleven; had tried other drugs; was in special education classes and had done poorly in school; had a low IQ; had family and legal issues in Chicago; exhibited characteristics of various psychological disorders; and that his mental difficulties may have had an organic basis. Bailey failed to request complete copies of the records that were missing pages and he failed to request any records on his own. Additionally, counsel failed to follow up with any of the potential witnesses interviewed by investigator Win-bush. Also, Bailey failed to do anything more than a brief, cursory telephone interview with Sadie Doss, who was his sole mitigation witness.
¶ 31. Counsel’s performance was clearly deficient under Strickland. However, Doss must also show that the deficient performance prejudiced his defense, i.e., but for counsel’s unprofessional errors, the result of the proceeding would have been different. Id., 466 U.S. at 687, 104 S.Ct. 2052. In Rompilla, the Court found:
The accumulated entries would have destroyed the benign conception of Rompilla’s upbringing and mental capac *708 ity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts. With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case. Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla’s family, whom trial counsel did not interview.
Rompilla, 545 U.S. at 391, 125 S.Ct. 2456. The Court then summarized the evidence that would have been unearthed, including that Rompilla’s parents were both severe alcoholics, that his mother drank during pregnancy, and that his father had a vicious temper and often beat both the mother and Rompilla. The Court also noted the evidence uncovered by Rompilla’s post-conviction counsel, specifically, that Rompilla suffered from organic brain damage, that his problems related back to his childhood and that they were likely caused by fetal alcohol syndrome. With regard to the prejudice prong of Strickland, the Rompilla Court said:
This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered “mitigating evidence, taken as a whole, ‘might well have influenced the jury’s appraisal’ of [Rompilla’s] culpability,” Wiggins v. Smith, 539 U.S. [510], at 538, 123 S.Ct. 2527, 156 L.Ed.2d 471 (quoting Williams v. Taylor, 529 U.S. [362], at 398, 120 S.Ct. 1495, 146 L.Ed.2d 389), and the likelihood of a different result if the evidence had gone in is “sufficient to undermine confidence in the outcome” actually reached at sentencing, Strickland, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.
Id. at 393, 125 S.Ct. 2456. If Doss’ trial counsel had reviewed the records provided by the public defender’s office in Shelby County and had followed up with potential witnesses, he would have uncovered mitigating evidence almost identical to that in Rompilla.
¶ 32. Pursuant to the Rompilla, Wiggins, and Williams cases cited above, the mitigation evidence discovered by Doss’ post-conviction counsel, “taken as a whole, might well have influenced the jury’s appraisal of Doss’ culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing.” Rompilla, 545 U.S. at 393, 125 S.Ct. 2456. Accordingly, the judgment of the Circuit Court of Grenada County denying post-conviction relief is reversed, and this matter is remanded to the trial court with instructions to vacate the death sentence and to grant Doss a new sentencing hearing.
PART TWO
LAMAR, Justice,
for the Court:
II. WHETHER THE DECISION IN ATKINS V. VIRGINIA REQUIRES THAT THE DEATH SENTENCE IN THIS CASE BE SET ASIDE.
¶ 33. In his request for post-conviction relief filed in 2003 with this Court, Doss alleged that his death sentence would violate the Eighth Amendment’s prohibition against the execution of the mentally retarded. See Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Doss relied on a neuropsychological evaluation performed by Dr. Michael *709 Gelbort and the affidavits of Dr. James Merikangas, a psychiatrist, and Jeffrey Eno, a clinical social worker. This Court found that “Doss has more than met the threshold requirement to be heard on the Atkins issue” and granted Doss leave to present his Atkins claim before the trial court. In so finding, this Court relied on its decision in Chase v. State, 873 So.2d 1013 (Miss.2004), wherein this Court attempted to clarify the application of Atkins v. Virginia in the trial courts of this state. In Atkins, the Supreme Court set forth two, almost identical, definitions of mental retardation.[5] Atkins, 536 U.S. at 309 n. 3, 122 S.Ct. 2242. These definitions were adopted by this Court in Foster v. State, 848 So.2d 172, 175 (Miss.2003), and further examined in Chase v. State, 873 So.2d 1013, 1029 (Miss.2004). Both definitions of mental retardation require not only significantly subaverage intellectual functioning, but also related or significant limitations in adaptive skills that occur before age eighteen. Atkins, 536 U.S. at 309 n. 3, 122 S.Ct. 2242. All three factors, (1) significant subaverage intellectual functioning, (2) related or significant limitations in adaptive skills, and (3) manifestation before age 18, must be met in order for the offender to be classified as mentally retarded and eligible for Atkins protection from execution. Id.
¶ 34. The case sub judice exemplifies what the Atkins majority recognized, that “[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded.... Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.” Id. at 317, 122 S.Ct. 2242. In examining the scope of Atkins, our Court has recognized that “Atkins exempts all mentally retarded persons — even those who are minimally mentally retarded— from execution.... ” Chase v. State, 873 So.2d 1013, 1026 (Miss.2004). With recognition of the difficulty in “determining which offenders are in fact retarded!,]” the Supreme Court left to the states “the task of developing appropriate ways to enforce the constitutional restriction” on the execution of sentences. Atkins, 536 U.S. at 317, 122 S.Ct. 2242. Unlike many states, *710 our state Legislature has not chosen to address the issue of mental retardation in the context of death-penalty litigation. Unless and until it does so act, we are bound to provide guidance to our trial courts and to apply the constitutional mandates of Atkins.
¶ 35. Following remand by this Court, the Grenada County Circuit Court in July 2004 ordered that Doss be sent to the Mississippi State Hospital (“Whitfield”) for a forensic mental health evaluation to assist the circuit court in determining whether Doss was mentally retarded as defined in Atkins and Chase. Doss was examined at Whitfield by Drs. Gilbert MacVaugh III, Criss Lott, John Montgomery, and Reb McMichael (“Whitfield doctors”) in November 2005. According to Dr. Lott, the Whitfield doctors found, to a reasonable degree of psychological and psychiatric certainty, that Doss was not mentally retarded as set forth in Atkins and Chase.[6] They specifically concluded that Doss had an overall IQ score of 70[7] and was in the borderline range of intellectual functioning. The evaluation stated that Doss’ true IQ score may have been higher, but possible malingering or fatigue may have factored into the scoring.
¶ 36. The evaluation further stated that Doss did not have a history of significant deficits in adaptive functioning due to intellectual limitations. The evaluation noted that Doss had worked, cared for himself, and met his own basic needs, and had shown no signs of significant deficits as far as social/interpersonal skills, communication, use of community resources or leisure activities were concerned. The evaluation stated that Doss’ suggested problems in areas such as functional academics, work, self-direction, health, and safety were better explained by his chaotic upbringing than by intellectual deficits. The evaluation found that Doss was “fairly adept in coping with the life demands for someone his age in that environment.”
¶ 37. Finally, the evaluation stated that, despite the presence of several risk factors for mental retardation, Doss had at least two prior psychological evaluations at the age of fifteen, neither of which resulted in a diagnosis of mental retardation. These evaluations found that Doss did not demonstrate deficits consistent with mental retardation prior to reaching the age of eighteen.
¶ 38. Doss also was examined by Dr. Daniel Grant in May 2005. Grant found that Doss’ test results were similar to test results obtained by other psychologists, which indicated consistent effort and a lack of malingering. Grant found that, as the complexity of a task increased, Doss’ level of performance decreased. Grant agreed with earlier findings of Dr. Gelbort that Doss’ test results and past history were consistent with “neuropsychological impairments and probable organic brain dysfunction” and were “likely both congenital and acquired at an early age.” Grant found that Doss’ IQ score of 71, recorded when he was fifteen, would actually be in the 66-to-67 score range when corrected. Grant found that the tests he had administered clearly placed Doss’ level of functioning within the mild mental retardation range of intelligence, and also showed sig *711 nificant impairments in adaptive-behavior skills. Grant found that Doss’ test results were “consistent with the diagnosis of Mild Mental Retardation as defined in the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition — Text Revision, Mental Retardation Definitions, Classification, and Supports, Tenth Edition published by the American Association on Mental Retardation and as described by the United States Supreme Court in the Atkins decision.”
¶ 39. Doss also was examined by Dr. Timothy Summers in July 2006. Summers did not perform any testing on Doss but relied on prior tests and reports by others. Summers found that Doss was mentally retarded “as defined in Atkins v. Virginia as manifested by an IQ of 71 and limitations in adaptive functioning in at least two areas of functioning significantly lower than his peers of equal age prior to the time that he was 18.” Summers further found that Doss “meets the mental retardation criteria(s) as defined by the American Association of Mental Retardation, which defines mental retardation as an IQ between 70-75 as well as adaptional functional limitations described above along with identification of sub average intellectual functioning prior to age 18.” Summers found that Doss “experienced significant limitations in his effectiveness in meeting the day to day challenges in learning, personal independence and social responsibility.” Summers found that Doss was easily influenced and had poor social judgment regarding association with negative peer groups. Summers concluded that Doss would likely be the least smart person in any peer group and had problems with logic, foresight, strategic thinking, and understanding consequences.
¶ 40. The circuit court considered the expert testimony and lay witnesses presented by the parties and found that Doss had not proven by a preponderance of the evidence that he was mentally retarded. The circuit court found that the Whitfield doctors, who had determined that Doss was not retarded, were more credible than Drs. Summers and Grant, who had found that Doss was retarded. The record revealed that Dr. Grant had not administered any tests to show lack of malingering, as required by Chase.[8] The court also found that Dr. Summers did not test for malingering.
¶ 41. The circuit court noted that all of the examiners had opined that Doss met the first requirement of mental retardation, that he displayed subaverage intellectual functioning, and, as a result, the court analyzed only the issue of deficits in adaptive functioning. The court noted that Drs. Grant and Summers had made the required findings in this area to determine that Doss was retarded. It further found that Dr. Grant had relied strictly on tests he had administered to Doss and had spoken to no family members or other persons besides Doss. The court found that the tests used by Grant had not been normed for prison populations. Dr. Summers made his finding based on his interview with Doss, affidavits from family members, and prior testing.
¶ 42. The circuit court noted that Drs. MacVaugh and Lott had interviewed Doss, numerous family members, and others who had observed him in the past. Doss was given two tests by the examiners at the Mississippi State Hospital to assess malingering, one of which indicted possible malingering. The court noted that Drs. Mac-Vaugh and Lott had determined that Doss did not have deficits in adaptive function *712 ing, and that Doss had held legal jobs and had obtained money illegally, saved and spent his money, bought his clothes and prepared his food, played sports, and engaged in personal relationships. The court found the Whitfield doctors’ “approach and the methodology that they used is much more compelling than the approach used by experts offered by Doss.” The circuit court adopted the findings of Drs. Mac-Vaugh, Lott, and McMichael, and found that Doss had failed to prove, by a preponderance of the evidence, that he was mentally retarded.
¶ 43. Doss argues that the circuit court erroneously rejected Dr. Grant’s finding of mental retardation because Dr. Grant failed to test for malingering as required by Chase. According to Dr. Grant, he determined that Doss was not malingering by the consistency of scores of tests taken in the past. While the circuit court certainly noted this action or inaction by Dr. Grant, this was not the only factor in its decision to reject Dr. Grant’s findings. Further, it was an appropriate consideration for the court when reviewing the totality of the evidence presented.
¶ 44. Doss next argues that the circuit court erred in accepting the opinions of Drs. MacVaugh and Lott over that of Dr. Grant on the issue of adaptive functioning, even though Dr. Grant was the only one to administer adaptive-functioning tests. Doss also argues that the tenth edition of Mental Retardation: Definition, Classification, Assistance, and Support, by the AAMR, specifically requires adaptive-functioning testing in order to determine mental retardation, and Dr. Grant’s opinion, which was based on the tenth edition of Mental Retardation and included such testing, was the only credible opinion given at Doss’ hearing. As we will explain infra, these arguments are flawed for two reasons: (1) this Court has recently held in Lynch v. State, 951 So.2d 549 (Miss.2007), that there is not one test to determine mental retardation, including the adaptive functioning component; and (2) there is no agreement among scholars or professionals as to the proper testing to be used in assessing adaptive functioning.
¶ 45. This Court clarified the nature of testing for and defining mental retardation in Lynch v. State:
Accordingly, in Mississippi it is acceptable to utilize the MMPI-II and/or other similar tests. Id. at 1029. This Court did not intend by its holding to declare the MMPI-II or any one test as exclusively sufficient. Having a variety of tests at their disposal, courts are provided with a safeguard from possible manipulation of results and diminished accuracy which might result if courts are limited to one test. The United States Supreme Court mentioned the Wechsler Adult Intelligence Scales Test. See Atkins, 536 U.S. at 309 n. 5, 122 S.Ct. 2242, 153 L.Ed.2d 335. Other tests, as suggested by mental health experts, include the Structured Interview of Reported Symptoms (SIRS), the Validity Indicator Profile (VIP), and the Test of Memory Malingering (TOMM). See Douglass Mossman, [Atkins v. Virginia ]: A Psychiatric Can of Worms, 33 N.M.L.Rev. 255, 277-78 (Spring 2003).
The Court’s interpretation in this case as to the proper test to be administered with regard to an Atkins hearing super-cedes any contrary decisions. This Court neither endorses the MMPI-II as the best test nor declares that it is a required test, and decisions that state otherwise are expressly overruled. See, e.g. Scott v. State, 938 So.2d 1233, 1238 (Miss.2006) (holding that despite the doctor’s use of a battery of other tests, administration of the MMPI-II is required prior to an adjudication of a claim *713 of mental retardation); Goodin v. State, 856 So.2d 267, 277 (Miss.2003) (declaring that the MMPI-II is to be administered for a determination of mental retardation since it is the best test to detect malingering). Our trial courts are free to use any of the above listed and approved tests or other approved tests not listed to determine mental retardation and/or malingering by a defendant.
Lynch, 951 So.2d at 556-57 (emphasis added). The trial court did not have the benefit of Lynch, as it was decided after the circuit court issued its opinion on Doss’ mental retardation. The Whitfield doctors followed Chase as this Court directed in Doss v. State, 882 So.2d 176, 190-91, 192 n. 1 (Miss.2004), and based their opinion on the ninth edition of Mental Retardation. Under Lynch, the experts who examined Doss and the circuit court were free to use or consider any approved test “to determine mental retardation and/or malingering by a defendant.” Lynch, 951 So.2d at 557.
¶ 46. Furthermore, the conceptualization of “adaptive behavior” or “adaptive skills” has proven elusive. Note, Implementing Atkins, 116 Harv. L.Rev. 2565, 2573 (2003); Lois A. Weithorn, Symposium: Conceptual Hurdles to the Application of Atkins v. Virginia, 59 Hastings L.J. 1203, 1219 (2008) (“there is no single, commonly-accepted conceptualization of ‘adaptive behavior’ ”); see also Dora W. Klein, Categorical Exclusions from Capital Punishment: How Many Wrongs Make a Right?, 72 Brooklyn L.Rev. 1211, 1234 n. 3 (2007) (noting that scholars and courts alike find that determinations regarding adaptive functioning are often subjective). There has been confusion not only about the concept itself, but also disagreement as to its value. Note, Implementing Atkins, 116 Harv. L.Rev. at 2575. Some studies have suggested that IQ remains the best way of measuring intelligence in some contexts. Id.; see also James W. Ellis and Ruth A. Luckasson, Symposium on the ABA Criminal Justice Mental Health Standards: Mentally Retarded Criminal Defendants, 53 Geo. Wash. L.Rev. 414, 422 n. 46 (citing Zigler, Balia & Hodapp, On the Definition and Classification of Mental Retardation, 89 Am. J. Mental Deficiency 215, 227 (1984)) (noting that three scholars have proposed that adaptive functioning be omitted from the definition of mental retardation because “ ‘the essence of mental retardation involves inefficient cognitive functioning’”).
¶47. Adaptive functioning historically has been assessed “on the inherently subjective bases of interviews, observations, and professional judgment.” Klein, 72 Brooklyn L.Rev. at 1235. In recent decades, researchers have developed an increasing number of test instruments for quantifying adaptive functioning, only a few of which have gained acceptance in the field. Id.; Weithorn, 59 Hastings L.J. at 1220. These tests provide a necessary objective measurement but offer no panacea. There are “no generally accepted psychometric instruments for measuring adaptive skill levels that are commensurate in reliability with IQ tests.” Note, Implementing Atkins, 116 Harv. L.Rev. at 2575 n. 72 (citing AAMR, Mental Retardation: Definition, Classification, and Systems of Supports, 24, 87-90 (10th ed.2002)) (noting that the AAMR concedes that there is no consensus regarding tests for adaptive behavior, but states there are a number of tests with “excellent psychometric properties”). One commentator suggests that existing measurement instruments are inadequate and have very little utility in the Atkins context. Weit-horn, 59 Hastings L.J. at 1222.
¶ 48. By citing these controversies, we in no way suggest that this Court abandon *714 the adaptive-behavior prong, or intimate that the tests for measuring adaptive functioning are inherently unreliable. Our point is to illustrate that there is considerable, sincere disagreement among professionals and scholars in the field as to the best method for measuring adaptive functioning. The concept and measurement of adaptive functioning is an unsettled area without consensus among experts and therefore, we cannot find that the Whitfield doctors’ opinions are baseless, or that the trial judge clearly erred in accepting their opinions.
¶ 49. We also find evidence which reasonably supports the trial judge’s conclusion that the opinions of the Whitfield doctors were more compelling. Although Dr. Grant tested Doss for impairments in adaptive-skill behaviors, he spoke to no family members or other persons besides Doss. Interviews with family members, and others familiar with an individual’s typical behavior over an extended period of time in various settings, can supplement or aid in the interpretation of test results. Peggy M. Tobolowsky, Atkins Aftermath: Identifying Mentally Retarded Offenders and Excluding Them From Execution, 30 J. Legis. 77, 98 (2003) (using different sources of data is recommended rather than placing sole reliance on the adaptive-skill assessment instrument); Linda Knauss & Joshua Kutinsky, Into the Briar Patch: Ethical Dilemmas Facing Psychologists Following Atkins v. Virginia, 11 Widener L.Rev. 121, 130-31 (2004). Additionally, testing instruments for assessing adaptive-functioning impairments can, for a variety of reasons, “be less than ideal for assessing adult criminal defendants who might be mentally retarded.” Klein, 72 Brooklyn L.Rev. at 1235 (citing certain problems such as the unavailability of caregivers or other reliable independent sources, the use of inappropriate norms, and the atypical environment of a prison); Knauss & Kutinsky, 11 Widener L.Rev. at 131 (“Few (if any) measures of adaptive functioning have been designed or normed for use with a correctional population. Thus, adaptive functioning prior to incarceration should be the target for assessment.”); Note, Implementing Atkins, 116 Harv. L.Rev. at 2576 (noting that an individual’s environment may add a layer of uncertainty to diagnosing adaptive-skill deficits). Indeed, Dr. Lott stated that he knew of no studies that have normed an adaptive-functioning test for those on death row, and Dr. Grant admitted that the adaptive-functioning tests he administered were not normed for a prison population.
¶ 50. In sum, we have in this case experts who take opposite positions as to whether Doss is mentally retarded. Neither side’s methodology, approach, or understanding of the issue is infallible. The ultimate issue of whether Doss is, in fact, mentally retarded for purposes of the Eighth Amendment, is one for the trial judge, who sits as the trier of fact and assesses the totality of the evidence as well as the credibility of witnesses. While expert opinions are helpful and insightful, the ultimate decision of mental retardation is not committed to the experts, but to the trier of fact. As the United States Supreme Court has noted, “the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law.” Kansas v. Crane, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002).
¶ 51. The trial judge heard all the evidence and the expert opinions offered, and found the Whitfield doctors to be more credible. The trial judge followed the procedures we set forth in Chase and concluded that Doss had failed to prove by a *715 preponderance of evidence that he is mentally retarded. For the reasons set forth herein, this Court cannot say that the trial judge clearly erred in doing so. Accordingly, this Court affirms the circuit court’s judgment to the extent that it denied post-conviction relief based on Doss’ Atkins claim.
CONCLUSION
¶ 52. Accordingly, for the reasons stated herein, the judgment of the Circuit Court of Grenada County is affirmed to the extent that it denied post-conviction relief based on Doss’ Atkins claim. The circuit court’s judgment is reversed to the extent that it denied post-conviction relief based on Doss’ claim of ineffective assistance of counsel during the penalty phase, and this case is remanded to the trial court with instructions to vacate Doss’ death sentence and to grant Doss a new penalty phase sentencing hearing, consistent with this Court’s opinion.
¶ 53. PART ONE: REVERSED AND REMANDED. PART TWO: AFFIRMED.
PART ONE: WALLER, C.J., DICKINSON, KITCHENS, AND CHANDLER, JJ., CONCUR. DICKINSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J. CHANDLER, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND DICKINSON, J. LAMAR, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J., RANDOLPH AND PIERCE, JJ.
PART TWO: WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.

. Incredulously, in her dissent, Justice Lamar characterizes our analysis of the affidavits as "lengthy and unnecessary” and then says "it is improper for this Court to consider” the affidavits of Lee Bailey and Kelvin Winbush because "they were never admitted into evidence before the trial court....” However, Justice Lamar quoted these very affidavits at length in her previous majority opinion, which is now being withdrawn on rehearing. Moreover, we quote the published opinion of this Court, Doss v. State, 882 So.2d 176 (Miss.2004), on Doss’ original application for leave and the trial court herein regarding these affidavits, which were indeed filed. Further, the trial court specifically discussed the affidavits in his Order and noted that he considered the affidavit of Lee Bailey. Finally, there was no objection to the use of Bailey’s affidavit in the trial court.

. Bailey admitted during redirect examination that he also could have filed a motion in limine to prohibit the introduction of evidence of the youth court charges, but failed to do so.

. The dissent would find Bailey’s failure to investigate Doss’ head injuries as proper under an entirely separate and inapplicable theory of competency. The dissent later notes the trial court's finding that "Doss did not appear to be insane.” Doss’ sanity is not at issue.

. Sandra Price, Sam Brown’s daughter who also lived with the family in Chicago, likewise testified during the PCR hearing that the family had lived in a very bad neighborhood, and that Brown had used drugs and was very angry and abusive toward the family. Price also testified about the home invasion in which she was raped and Doss was beaten, suffering a head injury, and that Doss was very quiet and kept to himself.

. The first definition was provided by the American Association on Mental Retardation (AAMR):
"Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, and work. Mental retardation manifests before age 18.”
Atkins, 536 U.S. at 309 n. 3, 122 S.Ct. 2242 (quoting Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992)).
The second definition was provided by the American Psychiatric Association:
"The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.” Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed.2000). “Mild” mental retardation is typically used to describe people with an IQ level of 55-75 to approximately 70. Id., at 42-43.

Id.

. A report setting forth the findings of the Whitfield doctors was admitted into evidence through the testimony of Dr. Lott. While the trial court received testimony from Drs. Lott, MacVaugh, and McMichael, the report entered into evidence provides the findings of all the doctors; thus, we speak in terms of the report’s contents.

. As the dissent aptly notes, the Whitfield Report lists a full-scale IQ score of 71. However, Dr. Gilbert MacVaugh testified that the correct score is 70.

. The court noted that Dr. Grant had assessed malingering in terms of consistency in test-taking behavior, but that he had not administered a specific test to assess malingering.