COLEMAN, Justice,
for the Court:
¶ 1. A DeSoto County jury convicted Sherwood Brown of one count of capital murder and two counts of murder and sentenced him to death. The Court grant *887 ed Brown’s successive petition for post-conviction relief and allowed Brown to proceed in the trial court on his claim that he was mentally retarded and exempt from execution. After a hearing, the trial court held that Brown had failed to prove by a preponderance of evidence that he was mentally retarded. Brown appealed.
Factual Background and Procedural History
¶ 2. The jury convicted Sherwood Brown of one count of capital murder, committed during the commission of felonious child abuse, for the murder of thirteen-year-old Evangela Boyd and two counts of murder for killing Verline Boyd and Betty Boyd, Evangela’s mother and grandmother. For the capital murder conviction, the jury sentenced Brown to death; the trial court imparted consecutive life sentences for the two counts of murder. A unanimous Supreme Court affirmed Brown’s convictions and sentences on direct appeal. Brown v. State, 690 So.2d 276 (Miss.1996).
¶ 3. Several years later, the Court unanimously denied Brown’s application for leave to seek post-conviction relief, in which he raised nearly seventy issues. Brown v. State, 798 So.2d 481 (Miss.2001). In 2004, Brown filed a successive application for leave to seek post-conviction relief, seeking permission to proceed in the trial court on his claim that he was mentally retarded and exempt from execution under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Chase v. State, 873 So.2d 1013 (Miss.2004). - The Court granted Brown’s request for leave. Brown v. State, 875 So.2d 202 (Miss.2004). The trial court held an Atkins hearing and heard testimony from Brown’s wife, a former teacher, the special-education director for DeSoto County Schools, and three doctors who had evaluated Brown.

A. Family and Educators

¶ 4. Brown presented testimony from his wife, Angela Brown, and his sixth-grade teacher, June Gilbreath. Angela testified that she met Brown in late 1989 or early 1990, and they married in July of 1990. Both were in their early twenties. Angela and Brown lived with Brown’s parents for four years until his arrest in 1994. According to Angela, Brown never lived away from his parents’ home, but they were working toward getting their own place when he was arrested. Angela testified that Brown did not manage money well, did not have a bank account, and did not pay bills, but that he gave Angela money for groceries sometimes and gave his mother money for bills occasionally. Angela said Brown spent his free time with friends, often using drugs. Angela described Brown as immature, reckless, easily frustrated, and irresponsible, saying, “[i]t was like someone had always taken care of him so he didn’t have to do anything.” However, she testified that Brown could cook basic things, that he ran errands to a nearby store, and that he picked up after himself.
¶ 5. Angela said Brown had worked delivering beer for both the Miller and Budweiser beer companies, but he did not drive the delivery truck. She testified that Brown did not have any problems getting up and dressing himself for work, although his mother drove him to work. Angela thought Brown was fired from Budweiser, but she could not remember the reason. She testified that Brown loved football, and his family had told her that, when Brown was in high school, they thought he had a promising football career. She also told a story she had heard from Brown’s mother that, as a child, Brown dressed himself and drove to church while his mother slept. Angela testified that Brown often argued with both of his parents, and *888 she described his mother as “volatile” and “explosive” due to her alcohol problem. Despite their troubles, Angela testified that Brown loved his parents. Brown had two sons by another woman. Angela said that Brown interacted well with the children, but he was not left alone with them.
¶ 6. June Gilbreath taught Brown in sixth grade; she served as his advisory teacher and managed his academic transcript that year. Gilbreath explained that her handwritten notation of “LD” on Brown’s transcript meant “learning disabled” or “learning disability.” Gilbreath said Brown struggled academically in elementary school. He repeated first grade and, despite failing grades, Brown received “social promotions” because of his size in the fourth and fifth grades. In sixth grade, his grades improved because they were “modified,” which meant Brown was given easier material and tests than the other students. Brown spent a year and a half in seventh grade before being promoted to the second semester of eighth grade. Gilbreath said Brown’s grades were modified again in the eighth grade, and he received higher grades that year. Looking at Brown’s standardized test scores, Gilbreath testified that Brown was at a second-grade reading level and a third-grade math level when he was in fifth grade. In sixth grade, he scored a third-grade reading level and a fourth-grade math level. Finally, Gilbreath testified that Brown’s transcript reflected that he put forth his best effort during school.
¶ 7. Susan Kizer testified for the State. Kizer is the special-education director for DeSoto County Schools and previously was a special-education teacher. Kizer reviewed Brown’s transcript and testified about the handwritten “LD” notation. She explained that “SLD” was the correct way to denote a learning disability; “LD” had no meaning to her and was not a customary way to acknowledge that a student was learning disabled. Kizer testified that a transcript would not necessarily indicate whether a student was in special education. She explained that a teacher should not make a determination of whether a student has a learning disability, as that determination is made only after a comprehensive evaluation. Kizer did not have personal knowledge as to whether Brown was in special education, and she was not able to locate any DeSoto County School records showing that he was, because school records are destroyed after seven years.

B. Expert Testimony

¶ 8. Brown presented Dr. Marc Zimmer-mann, a licensed psychologist, as a expert witness. Dr. Zimmermann was accepted as an expert in clinical psychology, forensic psychology, intellectual disability, and IQ testing. He said that it is difficult to determine whether someone is mentally retarded absent a full assessment because most mentally retarded individuals are mildly so. He explained that the Diagnostic and Statistical Manual Fourth Edition (DSM-IV) — the American Psychiatric Association’s compendium of mental diseases — provides that most mentally retarded individuals achieve sufficient social and vocational skills to maintain minimal self-support but need assistance to deal with “unusual social or economic stress.” According to Dr. Zimmermann, some mentally retarded individuals marry, have children, cook, clean, drive, maintain their appearance, and play sports.
¶ 9. Dr. Zimmermann explained the three criteria necessary for a diagnosis of mental retardation: significantly low intellectual ability, two adaptive functioning deficits, and- manifestation prior to age eighteen. Dr. Zimmermann evaluated Brown in preparation for the Atkins hearing; Brown was thirty-nine years old at *889 the time of the evaluation. Dr. Zimmer-mann used the Wechsler Adult Intelligence Scale, Third Edition, to measure Brown’s IQ, and found that he had a seventy-five full-scale IQ, falling within the mildly mentally retarded range. The State’s expert also found Brown’s IQ to be seventy-five. Dr. Zimmermann opined that the consistency indicated that the score was accurate and that Brown was not malingering. Dr. Zimmermann also administered the Rey-15 Item Test, which showed a low probability that Brown was malingering.
¶ 10. Next, Dr. Zimmermann analyzed Brown’s adaptive functioning deficits. He interviewed several people who knew Brown, reviewed his school and social security records, and administered the Vine-land Adaptive Behavior Scales to Brown’s wife. The Vineland measures a person’s ability to function in various aspects of life, covering the adaptive functioning areas listed in the DSM-IV.[1] He administered the test to Brown’s wife, Angela, because of a phenomenon called the Cloak of Competency, which posits that individuals tend to overestimate their own skills. Because the DSM-IV requires onset before age eighteen, ideally the tested person should have known the subject prior to that age. Although Angela did not know Brown pri- or to age eighteen, Dr. Zimmermann administered the Vineland to her because she was the person who knew Brown closest to age eighteen of those available to test. Dr. Zimmermann explained that he asked Angela to answer the questions by thinking back to when they first met, closest to age eighteen.
¶ 11. Based on the information provided by Angela, Dr. Zimmermann testified that the Vineland test revealed that Brown’s age equivalence for receptive speech was three years, seven months; expressive speech was seven-and-a-half years; written communication was ten years; personal daily living skills was ten- and-a-half years; domestic skills was thirteen years; community skills was nine years and ten months; interpersonal relationships was eleven-and-a-half years; and coping skills was three years, five months. Dr. Zimmermann conceded that Brown had the ability to take care of his own basic hygiene and to cook basic dishes. He acknowledged Brown’s substance abuse and opined that it evidenced an adaptive functioning deficit in health and safety. Questioned about Brown’s adaptive functioning deficit in academics, he opined that, while the “LD” notation may not be dispositive of a deficit, schools commonly label children as learning disabled rather than assess for mental retardation. Dr. Zimmermann concluded that Brown has significant adaptive functioning deficits in communication, self-care, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, and safety. Dr. Zimmermann opined that the deficits in adaptive functioning existed prior to Brown’s commission of the crime.
¶ 12. As for manifestation prior to age eighteen, Dr. Zimmermann identified Brown’s academic transcript and conflicts with family members as a child. He also pointed to several factors that could have predisposed Brown to mental retardation as a child: his mother’s alcohol use during pregnancy, head trauma from a childhood car accident, inhaling gasoline as a child, and his family’s history of mental illness. Ultimately, Dr. Zimmermann opined that Brown was mentally retarded, possessing *890 a seventy-five IQ and several adaptive functioning deficits, which he concluded manifested before age eighteen.
¶ 13. The State presented Dr. Robert Storer, the State’s psychologist, who also evaluated Brown in preparation for the Atkins hearing. Dr. Storer was accepted as an expert in clinical and forensic psychology. After evaluating Brown, Dr. Storer concluded that Brown is not mentally retarded. To measure Brown’s IQ, Dr. Storer administered the Wechsler Adult Intelligence Scale, Fourth Edition, which revealed that Brown had an IQ of seventy-five. Like Dr. Zimmermann, Dr. Storer testified that similar results in their respective testing bolstered their reliability. Dr. Storer administered several measures to determine whether Brown was malingering and concluded that he was not. Dr. Storer administered two tests to determine whether Brown possessed the ability to take a test designed to measure adaptive functioning deficits. The Wide Range Achievement Test indicated that Brown’s word-reading ability was just below a ninth-grade level and his sentence-comprehension ability was at a seventh-grade level. The Mini Mental Status Exam, which measures memory and dementia, indicated that Brown had minimal or no impairment in those areas.
¶ 14. Dr. Storer also evaluated Brown to determine whether he possessed any adaptive functioning deficits. Dr. Storer noted Brown’s ability to care for his children and take them to the doctor. He explained that, while not dispositive, that suggested Brown possessed good communication skills, awareness of health issues, and a sense of responsibility. Dr. Storer opined that Brown’s ability to cook evidenced his ability to care for himself and weighed against an adaptive functioning deficit in that area. Dr. Storer reviewed Brown’s academic transcript and noted that the fact that Brown had failed the first grade was of particular concern because failing early grades indicates more severe problems, but that it does not in and of itself mean a person is mentally retarded. Overall, he opined that the transcript revealed Brown was not a stellar student, but that he passed numerous grades and advanced in standardized test scores from year to year. Dr. Storer said he could not formulate an opinion as to what the “LD” notation meant. He acknowledged that Brown was probably in special education classes, but said that would not mean Brown had received the comprehensive testing necessary to determine if he was mentally retarded. Dr. Storer reported that Brown’s football coaches stated that he was never deemed academically ineligible to play football.
¶ 15. Dr. Storer opined that Brown’s participation. in the Job Corps indicated good use of community resources. Considering Brown’s work history, Dr. Storer testified that Brown’s numerous job changes could indicate an adaptive functioning deficit, but that it was more likely explained by his substance abuse. Dr. Storer acknowledged, however, that evidence pointed to Brown being fired, on one occasion, for fighting with a manager. Dr. Storer interviewed Brown’s father and Brown’s highschool girlfriend and mother of two of his children. Both indicated that Brown had a commercial driver’s license. Brown himself also claimed that he had a commercial driver’s license.
¶ 16. When asked if Brown’s fights with family members was evidence of mental retardation, Dr. Storer said it could be if Brown’s reaction resulted from a lack of understanding or inappropriate emotional response, but that he had seen no evidence of that. Instead, he found that fighting was not unusual in Brown’s family environment. Dr. Storer administered the *891 ABAS-II to measure adaptive functioning deficits and testified that the test did not reveal any adaptive functioning deficits. He concluded that Brown had difficulties in some areas, but none was significant enough to rise to the level of an adaptive functioning deficit. Thus, Dr. Storer opined that Brown was not mentally retarded.
¶ 17. Dr. Reb McMichael, the State’s psychiatrist, evaluated Brown along with Dr. Storer. He was called as a rebuttal witness by Brown’s counsel, but was not qualified as an expert. Dr. McMichael testified that approximately eighty-five percent of mentally retarded individuals are mildly mentally retarded. He testified that individuals with mild mental retardation are capable of driving cars, cooking, cleaning, maintaining personal hygiene, maintaining employment, getting married, and having children. Dr. McMichael was present for Dr. Storer’s interview with Brown and had input into Dr. Storer’s report. Because Dr. McMichael was not qualified as an expert, he was not permitted to testify as to whether he believed Brown to be mentally retarded.

C. Trial Judge’s Order

¶ 18. Following the hearing, the circuit judge entered an order on the Atkins issues. The order cited the Chase standard that a finding of mental retardation requires subaverage intellectual functioning, significant limitations in adaptive functioning in at least two areas, and onset prior to age eighteen. The trial judge found that Brown had the necessary subaverage intellectual functioning to be deemed mentally retarded pursuant to Atkins and Chase. Both experts determined that Brown had a full-scale IQ of seventy-five, and the parties agreed that Brown’s score placed him in the range necessary to satisfy the first Chase prong. The trial judge then considered the evidence and testimony regarding Brown’s academic skills, work history, self-care and home living, social/interpersonal skills, and health and safety. He concluded that Brown did not have any functional deficits in these areas. Thus, the trial court found that, while Brown had a low IQ, he failed to show that he had adaptive functioning deficits or mental retardation manifested before age eighteen. Therefore, the trial court held that Brown had failed to prove by a preponderance of evidence that he was mentally retarded. Brown appealed.
Discussion
¶ 19. Brown asserts that the trial court failed to apply the Chase standards correctly and that the opinion “is based on a misapplication of the law and factual conclusions unsupported by the substantial evidence.” Brown raises several assignments of error on appeal, each of which can be included under the following three issues: (1) whether the trial court applied an incorrect legal standard; (2) whether the trial court’s findings of fact were clearly erroneous; and (3) whether the trial court erred in admitting certain expert testimony.
¶20. Brown had the burden of proof at the evidentiary hearing to show by a preponderance of the evidence that he is mentally retarded and, thus, entitled to relief. Goodin v. State, 102 So.3d 1102, 1111, 1112 (¶¶ 30, 32) (Miss.2012). The standard of review following an evidentiary hearing in a post-conviction relief case is well settled:
“When reviewing a lower court’s decision to deny a petition for post[-] conviction relief this Court will not disturb the trial court’s factual findings unless they are found to be clearly erroneous.” Brown v. State, 731 So.2d 595, 598 (Miss.1999).... In making that determination, “[t]his Court must examine the entire record and accept ‘that evidence *892 which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court’s finding of fact-’ ” Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss.1987) (quoting Cotton v. McConnell, 435 So.2d 683, 685 (Miss.1983)). That includes deference to the circuit judge as the “sole authority for determining credibility of the witnesses.” Mullins, 515 So.2d at 1189[.]
Goodin, 102 So.3d at 1111 (¶ 30) (quoting Doss v. State, 19 So.3d 690, 694 (¶ 5) (Miss.2009)). Questions of law are reviewed de novo. Id.
I. Whether the trial court applied an incorrect legal standard to the application of the Chase standard.
¶ 21. “[T]he clinical definition of mental retardation requires (1) subaverage intellectual functioning (2) accompanied by significant limitations in at least two adaptive skills (3) that manifest before age eighteen.” Goodin, 102 So.3d at 1104 (¶ 2) (citing Atkins, 536 U.S. at 318, 122 S.Ct. 2242; Chase, 873 So.2d at 1027-28). Brown argues that the circuit judge applied an incorrect legal standard for three reasons: (1) he claims that the trial judge turned the “manifest before age eighteen” requirement into an evidentiary requirement that only evidence from people Brown knew before age eighteen could be used to prove adaptive functioning deficits; (2) Brown argues that the trial judge imposed a heightened burden when considering whether Brown proved the existence of an adaptive functioning deficit in functional academics; (3) Brown asserts that in the adaptive functioning area of work, the trial judge incorrectly focused his analysis on what Brown could do, rather than what he could not do.
A. Onset Prior to Age Eighteen
¶ 22. The parties dispute whether the Chase standard requires the petitioner to present evidence that adaptive functioning deficits manifested prior to age eighteen. Brown argues that “there simply is no requirement under Mississippi law that adaptive functioning deficits be present before age eighteen,” and he asserts that the Court has held that adaptive functioning deficits should be measured “prior to incarceration” not “before age eighteen.” Brown is taking the Court out of context. The rationale behind the Court’s statement that adaptive functioning deficits should be measured “prior to incarceration” is that deficits in adaptive functioning should not to be measured after the defendant has been incarcerated, because inmates do not have the option to perform the activities and behaviors that are assessed. Thus, assessment of adaptive functioning after a defendant has been incarcerated likely would not be an accurate assessment of his or her abilities at the time of the crime.[2] The Court clearly has held that the onset of significantly subaverage intellectual functioning and adaptive functioning deficits both must manifest prior to age eighteen.
This Court in Chase adopted the clinical definition of mental retardation set forth by the Supreme Court in Atkins. “Mental retardation refers to substantial limitations in present functioning.” Chase, 873 So.2d at 1027 (quoting Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242, *893 153 L.Ed.2d 335). According to the AAMR, mental retardation is characterized by: (1) “significantly subaverage intellectual functioning,” (2) “existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work,” (3) which “manifests before age 18.” Id. ...
Goodin, 102 So.3d at 1112 (¶ 33) (emphasis added). Brown’s argument that adaptive functioning deficits do not have to be present prior to age eighteen is without merit.
¶ 23. Brown also argues that the judge erroneously disregarded the results of the Vineland Adaptive Behavior test because Angela did not know Brown before he turned eighteen. The Vineland measures a person’s ability to function in various aspects of life, and that test was given to Brown’s wife, Angela. She was asked to recall back to as close to Brown being eighteen as possible. In his order, the trial judge acknowledged that the test had been administered to Angela. The judge also recognized that the doctor who had administered the test, Dr. Zimmermann, admitted that it would have been preferable for the test to be given to someone who knew Brown before age eighteen. In his discussion of the adaptive functioning deficits, the judge mentioned Angela’s testimony about Brown, including references Angela made to things she had heard about Brown as a child and teenager.
¶24. Under Atkins and Chase, the third requirement for proving mental retardation is manifestation before age eighteen. See Atkins, 536 U.S. at 308 n. 3, 318; Chase, 873 So.2d at 1022-23 (¶¶ 43-44). In Goodin, we held that an expert may utilize any accepted test of adaptive functioning deficits, but that a retrospective analysis is necessary to show onset prior to age eighteen. Goodin, 102 So.3d at 1114 (¶ 39). We stated:
This Court has noted the importance of interviewing family and friends knowledgeable about the defendant’s past. Interviews with educators or others in the community familiar with the defendant’s behavior before age eighteen also would provide valuable information. Adaptive-functioning tests may be administered to these individuals as well. A retrospective evaluation also could include a thorough review of school records, social history, and work history, among other things.
Id. The judge had before him testimony from expert psychologists who had evaluated Brown, interviewed Brown’s family members, friends, and former educators, and reviewed Brown’s school records, work history, family history, and social history. The judge also heard testimony from Brown’s wife and a former teacher. He had ample evidence of Brown’s behavior and abilities before age eighteen.
¶ 25. The trial judge outlined the evidence and testimony that had been presented and concluded that it was not persuasive that mental retardation had manifested before Brown was eighteen:
In an attempt to show onset of mental retardation prior to the onset of age eighteen, Dr. Zimmermann testified that the consumption of alcohol by Brown’s mother may have caused his mental retardation along with some head trauma Brown suffered. He also asserted that Brown’s family history of mental illness supports a finding that he is mentally retarded. Brown’s sixth grade teacher testified, and the State disputed, that Brown was in special education classes. No results of any psychological testing done before Brown was 18 was presented. On his school transcript, the California Achievement Test results showed *894 he was reading at a second grade level in the fifth grade and was almost a fourth grade level in math[,] and the next year he improved somewhat. The [e]ourt finds that the petitioner offered no persuasive testimony [that] supports the onset of mental retardation prior to age eighteen.
The judge considered and weighed all of the evidence presented and made a reasoned finding based on the evidence and testimony before him. Certainly the record does not indicate that the trial judge “ignored” the Vineland test results as Brown alleges. Although it cannot be concluded from the record that he did so, if the trial judge determined that less weight should be given to the Vineland test result because Angela did not know Brown before age eighteen or for any other reason, then he had the 'discretion to do so. We give deference to the trial judge as the ultimate finder of fact, and we will not reweigh the evidence on appeal.
¶ 26. Brown’s claim that the trial judge incorrectly heightened the standard by requiring Brown to utilize only evidence from before he was eighteen is not supported by the record.
B. Functional Academics
¶ 27. Next, Brown argues that the trial judge applied a heightened burden of proof in his analysis of functional academics. In his analysis of adaptive functioning in the area of functional academics, the judge considered conflicting evidence of whether Brown had been identified as a learning-disabled student. The judge also acknowledged that there was no evidence of a formal finding that Brown had a learning disability, “much less that the disability met the legal definition of mental retardation for Atkins purposes.” The judge had conflicting evidence before him from teachers, coaches, a principal, and Brown himself. However, it was not disputed that Brown failed to present evidence of a formal evaluation or finding of a learning disability. Even though his school records had been destroyed, Brown did not put on evidence of anyone who remembered that he had been formally evaluated.
¶ 28. The judge took into consideration that there was no evidence of a formal evaluation and considered that among all of the evidence presented, including: testimony of educators; Brown’s school transcript showing his grades and promotion through school; Brown’s reading level and sentence-comprehension skills, which were between a seventh-grade and ninth-grade level; and other test results presented by the experts. The judge concluded that Brown “did suffer some deficiencies in academic achievement,” but that the deficiencies did “not appear to be the type confined to those suffering from mental retardation.” He held that Brown did not satisfy the burden of proof for establishing that he had a significant deficit in adaptive functioning in the area of functional academic skills. Brown’s argument that the judge applied a heighten burden of proof is without merit.
C. Work
¶ 29. Finally, Brown argues that, in his analysis of the adaptive functioning area of work, the trial judge incorrectly focused on what Brown could do, rather than what he could not do. Brown cites a law review article for the proposition that the analysis of adaptive functioning deficits must focus on deficits, not abilities. But that view is inconsistent with our precedent, which has considered expert testimony regarding what a person is able to do in conjunction with what he or she cannot do. See Goodin, 102 So.3d at 1106, 1110-11; Thorson v. State, 76 So.3d 667, 673 (Miss.2011); Doss, 19 So.3d at 712. Assessing either deficits or abilities in a vacuum would not give a full picture of an individu *895 al’s functioning in any area. Further, other than the apparent inability to hold a job, evidence was not presented about what Brown could not do in the area of work. The trial judge did not err by considering Brown’s abilities along with his deficits.
¶ 30. Each of Brown’s claims regarding the trial court’s application of the correct legal standard is without merit. The trial judge applied the correct legal standard in determining whether Brown satisfied the Chase requirements.
II. Whether the trial court’s finding that Brown did not have significant deficits in adaptive functioning was clearly erroneous.
¶ 31. To satisfy the clinical definition of mental retardation, the petitioner must prove beyond a preponderance of the evidence that he had significant limitations in at least two adaptive functioning skills. Goodin, 102 So.3d at 1104, 1111 (¶¶ 2, 30) (citations omitted). Following an eviden-tiary hearing in a PCR case, the trial court’s findings of fact must be clearly erroneous to warrant reversal. Goodin, 102 So.3d at 1111 (¶ 30) (quoting Doss, 19 So.3d at 694). The adaptive skill areas to be considered are: communication, self-care, home living, social and interpersonal skills, use of community resources, self-direction, health and safety, functional academics, work, and leisure. Goodin, 102 So.3d at 1112 (¶ 33); Chase, 873 So.2d at 1027-28 (¶ 69).
¶ 32. Brown claims that the trial court’s finding that he did not have significant adaptive functioning deficits in the areas of functional academics, work, self-care and home living, social/interpersonal skills, and health and safety was clearly erroneous. Brown takes issue with the trial judge’s conclusion that many of Brown’s job difficulties and trouble in the areas of social/interpersonal skills and health and safety could have been attributed to a substance abuse problem. While the judge did note that many of the cited issues were consistent with someone who had a substance abuse problem, that was not the only evidence he considered. In a twelve-page order, the judge outlined the testimony and evidence presented regarding each area of adaptive functioning.
¶ 33. The trial judge first considered whether Brown had an adaptive functioning deficit in the area of functional academic skills. The judge outlined the testimony from Gilbreath, Kizer, Dr. Zimmermann, and Dr. Storer and concluded that “Brown did suffer from some deficiencies in academic achievement,” but “the deficiencies do not appear to be the type confined to those suffering from mental retardation.” He stated that other than the “LD” notation, “no proof has been presented that there was ever a finding that Mr. Brown suffered from a learning ‘disability’ much less that the disability met the legal definition of mental retardation for Atkins purposes.” Finally, the judge found that Brown’s academic difficulties were “simply not unique and could equally be explained by any number of reasons other than an ‘adaptive functioning deficit,”’ and that Brown had failed to satisfy his burden of proof to show a significant adaptive functioning deficit in functional academic skills.
¶ 34. Next, the trial judge analyzed whether Brown had an adaptive functioning deficit in the work area. The order discussed Dr. Zimmermann’s testimony that Brown had lost several jobs for poor performance or fighting with his supervisors and his expert opinion that Brown had a corresponding adaptive functioning deficit. The trial judge noted that Brown worked as a delivery person for several companies; worked for an energy compa *896 ny; worked as a packer on an assembly line; and had been in the Job Corps. The order discussed Dr. Storer’s expert findings that, though frequent jobs changes could evidence an adaptive functioning deficit, he did not attribute Brown’s struggles to an adaptive functioning deficit and opined that the job difficulties may have been due to Brown’s substance abuse. The trial judge concluded that Brown did not have a significant adaptive functioning deficit in work. The order reasoned that “the testimony presented could clearly be explained just as easily as a substance abuse problem as a mental retardation indicator.” The judge found that Brown’s ability to perform his jobs made substance abuse a more likely cause of his termination, and that his repeated job turnover did not establish an adaptive functioning deficit.
¶ 35. The judge then considered whether Brown had an adaptive functioning deficit in the areas of self-care and home living. The trial judge considered that Brown had never lived on his own, did not understand money, and could not manage his own finances, but could cook, clean, and take his children to the doctor. The judge concluded that, while Brown continued to live with his parents as an adult and. allowed his mother and wife to take care of him, that “does not meet the definition of an adaptive functioning deficit” and “fits the expected pattern of a drug abuser.”
¶ 36. Analyzing whether Brown had an adaptive functioning deficit in social and interpersonal skills, the judge noted that Brown had several violent confrontations with family members and that Brown claimed he was fired from various jobs for fighting with management. The fights with his family members often occurred at home, which seemed to be a volatile setting where fighting was common. The judge concluded that the outbursts of anger described would be common for someone with a substance abuse problem and that Brown had failed to prove an adaptive functioning deficit.
¶ 37. Finally, the order considered whether Brown had an adaptive functioning deficit in the areas of health and safety. The order noted Dr. Zimmermann’s expert opinion that Brown’s substance abuse both later in life and as a child was indicative of an adaptive functioning deficit and a predisposing factor for mental retardation. The judge also noted that Brown’s wife had reported that he was a reckless driver, totaling several cars, and that he did not go to the doctor on a regular basis. He concluded that “[tjhese are mere isolated incidents some of which clearly reflect substance abuse” and “a broad statement that Brown did not regularly go to the doctor or to a dentist is insufficient.”
¶ 38. Although Dr. Zimmer-mann opined that Brown had significant deficits in adaptive functioning, Dr. Storer concluded that Brown’s scores on formal measures of adaptive functioning were below average, “but not two standard deviations or more below average as would be required for a diagnosis of mental retardation.” A “conflict in the evidence presented is properly resolved by the trier of fact[,j” in the case sub judice, the trial judge. Martin v. State, 871 So.2d 693, 698 (¶ 18) (Miss.2004). We will not reweigh evidence or make findings of fact. “Fact-finding is left to the trial courts, and we ‘review findings of fact with great deference.’ ” Butler v. State, 102 So.3d 260, 270 (¶ 29) (Miss.2012) (citing Scott v. State, 981 So.2d 964, 969-70 (¶ 21) (Miss.2008)).
¶ 39. In the instant case, the trial court considered expert testimony, psychological testing and evaluation, school records, social history, work history, testimony from' teachers, and testimony from Brown’s wife, and found that Brown had failed to *897 prove by a preponderance of the evidence that he had significant limitations in at least two adaptive functioning skills. Brown’s case is not “a rare case that merits reversal, because the evidence is so convincing, barely controverted, and covers such a span of time.” Goodin, 102 So.3d at 1113 (¶ 37). Giving the appropriate deference to the trial judge as the finder of fact and viewing the evidence in the light most favorable to the trial court’s findings, the judge’s findings were supported by the evidence presented and were not clearly erroneous.
III. Whether the trial court erred by admitting Dr. Storer’s report into evidence and by relying on certain statements therein.
¶ 40. Brown claims that it was an abuse of discretion for the trial court to admit Dr. Storer’s expert report into evidence because it contained inadmissible hearsay. He also asserts that the trial judge erroneously relied on statements about his substance abuse that were contradicted at the hearing and that the trial judge should not have relied on information in the report from individuals who did not testify at the hearing.
A. Admissibility of Expert Reports
¶ 41. Brown asserts that expert reports are hearsay and, as a general rule, it is error to admit an expert report into evidence. “ ‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Miss. R. Evid. 801(c). Certainly, expert reports may contain statements from individuals not called to testify at trial, because an expert is allowed “to base his opinion on the opinions of others [that] are not in evidence so long as experts in the field ordinarily rely on such opinions in forming their own opinions.” Alexander v. State, 759 So.2d 411, 420 (¶ 30) (Miss.2000) (quoting Gray v. State, 728 So.2d 36, 56-57 (¶ 86) (Miss.1998) (citing Miss. R. Evid. 703)).
¶ 42. Brown claims that the trial court erred by considering statements made to Dr. Storer by Albert Brown, Brown’s father, and Constance Carter, Brown’s high school girlfriend and the mother of two of his children. Brown argues that the statements were hearsay and that he did not have the opportunity to cross examine the individuals. Dr. Storer testified that he had interviewed both individuals, and he testified as to the information they provided, which largely pertained to Brown’s work history. Both said that Brown drove a delivery truck and that he had a commercial driver’s license. The statements in question were not offered “to prove the truth of the matter asserted.” Rather, the statements were used to explain the basis of Dr. Storer’s conclusions and opinions regarding Brown’s work history. Thus, the statements were not hearsay. See Flowers v. State, 842 So.2d 531, 559 (¶ 87) (Miss.2003).
¶ 43. Further, the weight and credibility of expert testimony is to be determined by the trier of fact. Ladnier v. State, 878 So.2d 926, 931 (¶ 16) (Miss.2004). When, as here, the finder of fact is faced with expert opinion testimony based on facts not within the personal knowledge of the expert, that the undergirding facts are not within the personal knowledge of the expert goes to the overall weight of the expert’s opinions. See McCaffrey v. Puckett, 784 So.2d 197, 203 (¶ 19) (Miss.2001). Accordingly, it stands to reason that the finder of fact must be able to examine the underlying facts to make the necessary credibility determinations. To the extent the trial judge examined the testimony of nontestifying individuals, which was included in the expert’s report and about which *898 the expert testified at the hearing, to determine the credibility of Dr. Storer’s expert opinion and the weight to give said opinion, we hold that the trial judge did not err.
¶ 44. As to the admission of the report in general, Dr. Storer was called to testify and testified in detail about his report, his opinions, and the information gleaned from interviewing Brown’s family and friends. Brown had a sufficient opportunity to cross-éxamine Dr. Storer. In a fact-intensive situation in which expert testimony is necessary, such as in determining mental retardation, the circuit judge could benefit from having the expert reports available after the hearing. The judge, noting that it was a bench trial with no jury, acknowledged the argument that expert reports contain hearsay and assured counsel that he would designate the portions of the report relied upon. The judge also admitted Dr. Zimmer-mann’s expert report. “Our well-established standard of review for reviewing the trial court’s admissibility of evidence, including expert testimony, is abuse of discretion.” Jones v. State, 918 So.2d 1220, 1223 (¶ 9) (Miss.2005) (citations omitted). Where the admission of the evidence did not result in prejudice to the accused, we will affirm the trial court. Id. There is no evidence that the trial judge relied on anything from Dr. Storer’s report that was not presented at the hearing. We cannot say that admitting the report resulted in prejudice to Brown. Thus, we hold that the judge did not err in admitting the expert report in the instant case.
B. Substance Abuse
¶ 45. Brown also asserts that the trial court relied on a statement in the expert report that Dr. Storer conceded at the Atkins hearing was not true as a basis for finding that Brown did not have a significant adaptive functioning deficit in the area of work. .Brown is referring to the trial judge’s conclusion that Brown’s numerous jobs and failure to hold a job “could clearly be explained just as easily as a substance abuse problem as a mental retardation indicator.” Brown claims that the judge improperly relied on the following statement from Dr. Storer’s report: “Mr. Brown had occupational difficulties in that he was fired from several jobs. During our interview of him, however, he reported that he was usually fired as a result of substance use influencing his performance and not because he was unable to do the work.” Brown claims that the judge improperly relied on the foregoing statement because, at the Atkins hearing, Dr. Storer said that statement was not true. The record does not support Brown’s claim.
¶ 46. At the hearing, Dr. Storer clarified that Brown did not say “I was fired for substance abuse.” Rather, in response to Dr. Storer’s question about why Brown stopped working for Miller and Budweiser, Brown’s exact words were:
I think, I think I quit the first time, got into it with supervisor the second time ... got fired at Budweiser ... guess my performance wasn’t good enough ... I was supposed to be a merchandiser ... switching beer around ... oldest stuff in the front ... wasn’t going to the stores (laughing) getting drunk!
The quote from Brown was in Dr. Storer’s report and was read verbatim at the hearing. Dr. Storer also testified that Brown had told him “that many of his employments were [a]ffected by his substance use.” Dr. Storer’s statement in the report that “[Brown] reported that he was usually fired as a result of substance use influencing his performance and not because he was unable to do the work” was not contradicted by his testimony at the hearing. *899 Certainly, Brown’s own statement that he got fired because he was getting drunk instead of going to work indicates that he was fired because substance abuse influenced his performance.
¶47. The experts and lay witnesses ' presented a significant amount of evidence about Brown’s substance abuse, which began as early as age six or seven. The trial judge, as the finder of fact, who had the opportunity to hear all of the witnesses’ testimony and review the evidence, could have determined that Brown’s own admission that he was getting drunk instead of going to work, coupled with the testimony about his substance abuse, could have been a reason for his being fired. That determination could have been reached without the report being admitted into evidence, because Brown’s quote was read verbatim at the hearing. There is no indication from the record that the trial judge relied on any statement that was not true or was improperly admitted into evidence.
¶ 48. The judge noted the possibility that Brown had a commercial driver’s license, that Brown had received job training, and that there was no indication that Brown could not perform the functions of his jobs. Thus, it seemed more likely that substance abuse was the cause of his problems. Further, the judge stated that just because a person’s having many jobs can be an indicator of a deficit in adaptive functioning does not mean it unequivocally establishes an adaptive functioning deficit: Where the evidence and testimony indicate that other causes for having many jobs are present, the court has the discretion to weigh all of the evidence and make that determination. The issue is without merit.
Conclusion
¶ 49. The trial judge heard the testimony, considered the testimony and evidence presented, followed the procedure established in Chase, and applied the correct legal standard for determining whether Brown was mentally retarded under Atkins and Chase. Giving deference to the trial judge as the finder of fact, we cannot say that his findings were clearly erroneous.
¶ 50. AFFIRMED.
WALLER, C.J., RANDOLPH, P.J., CHANDLER AND PIERCE, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J. LAMAR, J., NOT PARTICIPATING.

. The adaptive functioning areas are: communication, self-care, home living, social and interpersonal skills, use of community resources, self-direction, health and safety, functional academics, work, and leisure. Chase, 873 So.2d at 1027-28 (¶ 69).

. See Doss v. State, 19 So.3d 690, 714 (¶ 49) (Miss.2009) (quoting Linda Knauss and Joshua Kutinsky, Into the Briar Patch: Ethical Dilemmas Facing Psychologists Following Atkins v. Virgina, 11 Widener L. Rev. 121, 131 (2004) ("Few (if any) measures of adaptive functioning have been designed or normed for use with a correctional population. Thus, adaptive functioning prior to incarceration should be the target for assessment.")).