# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-00123-SCT

*STATE OF MISSISSIPPI*

*v.*

*KEVIN SCOTT a/k/a KEVIN V. SCOTT a/k/a KEVIN VINCENT SCOTT a/k/a KELVIN SCOTT a/k/a KELVIN VINCENT SCOTT*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/14/2014 |
| TRIAL JUDGE: | HON. JOHNNIE E. WALLS, JR. |
| TRIAL COURT ATTORNEYS: | JASON L. DAVIS |
| | JAMES W. CRAIG |
| | MEGHAN SHAPIRO |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON L. DAVIS |
| |    BRAD ALAN SMITH |
| ATTORNEYS FOR APPELLEE: | JAMES W. CRAIG |
| | MEGHAN SHAPIRO |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | AFFIRMED AND REMANDED - 06/01/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     A Bolivar County Circuit Court judge ruled death-row inmate Kevin Scott was intellectually disabled and thus ineligible for the death penalty under the Eighth

Amendment.[1]  The State has appealed.  It argues: (1) the trial judge ignored the mandate of

***Scott II***,[2] which directed Scott take a specific malingering test before his intellectual-

disability hearing; (2) the trial judge abused his discretion when he permitted Scott's experts

to testify at the intellectual-disability hearing; and (3) the trial judge failed to make

independent findings of fact and conclusions of law when ruling Scott intellectually disabled.

¶2.     We find no reversible error.  The requirement to take a specific malingering test was

expressly overruled four months after the mandate in ***Scott II***.[3]  And the admission of Scott's

experts was within the sound discretion of the trial court.  Finally—though the State had

ample opportunity to do so—it made no attempt to supplement the record to prove its

allegation that the trial judge recited Scott's proposed findings instead of making his own

independent findings.  In short, the State's failure to provide record evidence of this claim

prohibits us from reviewing it.

¶3.     Thus, we must affirm the order vacating Scott's death sentence based on the finding

of intellectual disability.  This finding does not relieve Scott from criminal culpability and

punishment.[4]  Scott's conviction for capital murder still stands.  We remand this case to the

---

[1] *See **Atkins v. Virginia***, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (holding that, based on "evolving standards of decency," imposing the death penalty on intellectually disabled persons violates the Eighth Amendment).

[2] ***Scott v. State***, 938 So. 2d 1233, 1238 (Miss. 2006) (***Scott II***).

[3] *See **Lynch v. State***, 951 So. 2d 549, 557 (Miss. 2007) (clarifying that an ***Atkins*** claimant may use any approved tests and procedures and does not have to take the Minnesota Multiphasic Personality Inventory II (MMPI-II)).

[4] *See **Atkins***, 536 U.S. at 306, 122 S. Ct. at 2244.

2

Bolivar County Circuit Court for Scott to be resentenced.[5]

## Background Facts and Procedural History

### I. Direct Appeal

¶4. In November 1995, eighteen-year-old Scott killed Richard Lee while stealing his car.[6] In 1998, he was tried before a Bolivar County jury, which found him guilty of capital murder. After a separate hearing, the jury sentenced Scott to death.

¶5. Scott appealed. We affirmed Scott's conviction and death sentence. *Scott I*, 878 So. 2d 933. In doing so, we rejected Scott's argument that he was intellectually disabled and—based on the recently handed-down United States Supreme Court opinion, *Atkins v. Virginia*—ineligible for execution.[7] *See Atkins*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (holding that imposing the death penalty on intellectually disabled persons violates the Eighth and Fourteenth Amendments). But we acknowledged Scott could be eligible for a hearing on his intellectual-disability claim if he attached a sufficient affidavit to his postconviction-relief (PCR) application. *Scott I*, 878 So. 2d at 948.

### II. PCR Application

¶6. Scott timely filed an application for PCR, which we granted in part in 2006. We remanded to the Bolivar County Circuit Court the single issue of Scott's alleged intellectual

---

[5] *See* note 16, *infra*.

[6] More details of the murder and Scott's related aggravated-assault conviction can be found in *Scott v. State*, 878 So. 2d 933, 939-42 (Miss. 2004) (*Scott I*).

[7] While *Atkins* used the term "mentally retarded," as did this Court when we adopted the *Atkins* standard, that term has since been replaced by "intellectually disabled." *See Chase v. State*, 171 So. 3d 463, 466 n.1 (Miss. 2015) (*Chase III*).

disability. ***Scott II***, 938 So. 2d at 1250.

¶7.     In contrast to his direct appeal, we found Scott had provided the necessary affidavit to entitle him to an ***Atkins*** hearing. ***Id.*** at 1238. The State conceded the affidavit by Scott's expert, Dr. Marc Zimmerman, satisfied the deficiencies we found in ***Scott I***. But the State took issue with "the findings and methods of Dr. Zimmerman." ***Scott II***, 938 So. 2d at 1238. In particular, the State asserted "Dr. Zimmerman failed to administer the Minnesota Multiphasic Personality Inventory II (MMPI-II)," which at the time was "required prior to an adjudication on a claim of mental retardation pursuant to ***Atkins***."[8] ***Id.*** In response, "Scott argued that the MMPI-II is not an appropriate test for individuals with mental retardation," citing Dr. Zimmerman's opinion "that the MMPI-II test would be of 'questionable value' because Scott is unable to read beyond a third-grade level." ***Id.*** But as "this Court ha[d] not disregarded the MMPI-II test," we mandated that, "prior to an adjudication on the mental retardation issue, Scott must obtain a MMPI-II test." ***Id.***

¶8.     Four months later, however, this Court *did* disregard the MMPI-II—or at least stopped making the MMPI-II a mandatory requirement. ***Lynch***, 951 So. 2d at 557. Under the ***Atkins*** guidelines adopted in ***Chase v. State***, 873 So. 2d 1013, 1029 (Miss. 2004),[9] this court held that the defendant's expert was permitted to perform the MMPI-II "and/or other similar

_____

    [8] In this Court's first ***Atkins*** case, we held "that the Minnesota Multiphasic Personality Inventory-II (MMPI-II) is to be administered since its associated validity scales make the test best suited to detect malingering." ***Foster v. State***, 848 So. 2d 172, 175 (Miss. 2003).

    [9] All references in this opinion simply to "***Chase***" refer to our 2004 opinion, ***Chase v. State***, 873 So. 2d 1013 (Miss. 2004). Reference to other ***Chase v. State*** opinions are distinguished by either "***Chase II***" or "***Chase III***."

tests." **Lynch**, 951 So. 2d at 556 (quoting **Chase**, 873 So. 2d at 1029). So in **Lynch**, we clarified that "trial courts are free to use any . . . approved tests . . . to determine mental retardation and/or malingering by a defendant." **Id.** at 557.

### III.  *Atkins* **Hearing**

¶9.    Scott's *Atkins* hearing was finally held over two days in December 2013 and one day in January 2014.

¶10.   For Scott's *Atkins* hearing, Dr. Zimmerman appended his 2005 report to address adaptive functioning. And in 2012, Dr. Zimmerman interviewed six of Scott's family members face-to-face, administering retroactive Vineland Surveys. Based on those surveys and Scott's school records, Dr. Zimmerman concluded Scott had adaptive-functioning deficits in at least five areas.

¶11.   But Dr. Zimmerman left unaltered the part of his 2005 report in which he concluded Scott's similar results on two different IQ tests administered on the same day—a 63 on the Wechsler Adult Intelligence Scale-III (WAIS-III) and a 65 on the Kaufman Adolescent and Adult Intelligence Test (Kaufman)—sufficiently eliminated the possibility that Scott was malingering.

¶12.   This prompted the State to start the hearing with an objection. The State argued Scott should not be permitted to move forward because he had not complied with this Court's specific mandate in **Scott II**. The State conceded the specific directive to administer the MMPI-II had been overruled by **Lynch**. However, it argued Scott's expert still had to administer some type of "malingering instrument" before the hearing. According to the

5

State, Dr. Zimmerman's method for ruling out malingering—back-to-back IQ tests on the same day—would not suffice, because it had not been peer-reviewed or widely accepted in the forensic-psychology field.

¶13.	The trial judge postponed ruling on the State's motion until after Dr. Zimmerman testified about his testing procedures. During Dr. Zimmerman's redirect, Scott's counsel presented an article by Dr. Gilbert S. Macvaugh and Dr. Mark D. Cunningham, "*Atkins v. Virginia*: Implications and Recommendations for Forensic Practice," 37 J. Psychiatry & L. 131 (2009). According to the article, "Although several instruments exist that are designed to assess malingering of memory and cognitive deficits, these instruments lack sufficient normative data for persons with mental retardation in their standardized samples." Consequently, the study suggests that administering these instruments "create[s] the risk of false positives." *Id.* at 172-73. Moreover, the article claims studies investigating the validity of malingering instruments on the intellectually disabled "have produced mixed results." *Id.* at 173. In Drs. Macvaugh and Cunningham's opinion, assessing suboptimum effort is "greatly assisted by the presence of intellectual assessment results that predate the capital charge. The stability of results from repeated intellectual assessments that are separated by years . . . is also of inferential benefit." *Id.* While they admitted they were "aware of no longitudinal research investigating this premise," they opined "it would seem to be a task of improbable complexity to 'dial in' a performance consistent with mild mental retardation on multiple test administrations separated by years, particularly when different instruments have been employed." *Id.*

¶14. Based on this article, the trial judge overruled the State's objection and accepted Dr. Zimmerman's expert testimony that, to a reasonable degree of certainty, Scott met the three criteria for intellectual disability and was not malingering.

¶15. The judge also overruled the State's objection to school psychologist Gussie Farris being tendered as an expert. Farris testified that when Scott was in eighth grade his mother asked for a comprehensive assessment of Scott. As part of the assessment team, Farris administered the Wechsler Intelligence Scale for Children (WISC) to Scott, who received a full-scale score of 68. While this score put Scott in the intellectually disabled range, Farris said she did not classify Scott as "educable mentally retarded" due to the unwritten school policy not to classify African-American male students like Scott as educable mentally retarded unless absolutely necessary.[10] Because Scott's scores "could go either way"—meaning she could classify him as "educable mentally retarded" or "specific learning disability"—she chose to classify him as the latter. But in her expert opinion, Scott was mentally retarded.

¶16. In addition to Dr. Zimmerman's and Farris's expert testimony, the trial judge heard from two lay witnesses—Diane Scott, Scott's mother; and Linda Brasel, Scott's special-education teacher.

¶17. The State's expert, Dr. Robert M. Storer, then testified. In contrast to Dr.

---

[10] Farris testified this policy stemmed from the "*Mattie T.*" litigation—a forty-year class action based on disparate treatment of black special-education students in Mississippi. *See* S. Herr, *Special Education Law and Children with Reading and Other Disabilities*, 28 J. Law & Educ. 337, 361 (July 1999)) (unpublished) (noting *Mattie T. v. Holladay*, DC74-31(S) (N.D. Miss.), resulted in a consent decree "to overhaul Mississippi's special education system").

Zimmerman, Dr. Storer believed Scott was malingering. Dr. Storer had tested Scott in 2012. He administered to Scott several malingering tests[11] and the WAIS-IV. Dr. Storer concluded Scott was exaggerating psychological symptoms and had given inconsistent effort. Because of this, Dr. Storer testified he was unable to evaluate Scott's true intellectual ability. Dr. Storer also testified he was unable to conclude Scott had any adaptive-functioning deficits due to conflicting information from Scott's family members.

¶18. At the conclusion of the hearing, the judge ruled that Scott had proved by a preponderance of the evidence that he is intellectually disabled and, thus, under *Atkins*, could not be executed. By order, the judge vacated Scott's death sentence.

## IV. State's Appeal

¶19. The State has appealed the trial judge's order. The State raises five claims:

1. The trial judge reversibly erred when he denied the State's objection that Dr. Zimmerman gave no malingering measure as ordered by this Court.

2. The trial judge erred in holding Dr. Zimmerman had administered a valid malingering test.

3. The trial judge erred regarding the testimony of school psychologist Gussie Farris.

4. The trial judge erred in relying on the testimony of Dr. Zimmerman to determine Scott was intellectually disabled.

5. The trial judge's judgment must be vacated and remanded so that he may issue his own findings of fact and conclusions of law and enter a new judgment on that basis.

---

[11] To test for effort and malingering, Dr. Storer administered the Rey Fifteen Item Memory Test (RMT), the Test of Memory Malingering (TOMM), the Miller Forensic Assessment of Symptoms Test (M-FAST), and the Validity Indicator Profile (VIP).

**Discussion**

### I.      No Record Evidence

¶20.    We begin with the State's last claim—the trial judge failed to make independent findings.  The State asserts the judgment was not based on the circuit court's *own* findings of facts and conclusions of law but instead reflects an almost-verbatim adoption of Scott's proposed findings of facts and conclusions of law.

¶21.    This is a serious allegation.  As this Court has said, "[t]he ultimate issue of whether [an *Atkins* claimant] is, in fact, [intellectually disabled] for purposes of the Eighth Amendment, is one for the trial judge, who sits as the trier of fact and assesses the totality of the evidence as well as the credibility of witnesses."  *Doss v. State*, 19 So. 3d 690, 714 (Miss. 2009).  And only when a trial judge's finding on intellectual disability is "clearly erroneous" may this Court disturb it.  *Goodin v. State*, 102 So. 3d 1102, 1111 (Miss. 2012).  But how can this Court apply a "clearly erroneous" standard when there is serious doubt as to whether the trial judge made his own findings on the issue of Scott's intellectual disability?   In other words, adopting one side's proposed findings—versus making independent findings—seriously undermines the trial judge's role as the fact-and-credibility finder, as well as this Court's deferential standard of review.  Indeed, in *Chase v. State*, 112 So. 3d 421, 422 (Miss. 2013) (*Chase II*), the trial judge's wholesale adoption of the State's proposed findings "rais[ed] concerns"—so much so that this Court specifically mandated the trial judge "issue his own Findings of Fact and Conclusions of Law" on remand.

¶22.    But after contending that the trial judge's adoption of Scott's proposed findings

9

requires reversal, the State wholly fails to support its contention with record evidence. Instead, the State attached a copy of Scott's proposed findings as an exhibit to its brief, asking us to compare the document with the judge's order. But as the State is well aware, the State did not make this document part of the record, and merely attaching something to a brief does not make it record evidence. And as the State is also well aware, this court is precluded from delving into matters outside the record. *See **Hampton v. State***, 148 So. 3d 992, 995 (Miss. 2014) (and cases cited therein); ***Keller v. State***, 138 So. 3d 817, 873-74 (Miss. 2014). The State does not explain why it never sought to make Scott's proposed findings of facts and conclusions of law a part of the record. Nor does it explain why it never moved to supplement the record once it was filed with this Court. *See* M.R.A.P. 10(e).

¶23. Moreover, given the seriousness of the State's contention—and Scott's concession of the similarity between his proposed findings and the judge's order—this Court actually ordered the Bolivar County Circuit Court to make an evidentiary finding whether the document the State attached to its brief had in fact been submitted by Scott's counsel to the trial judge. Prior to the trial court's determination, the State made no attempt to present evidence to the trial court to support its contention or otherwise ensure Scott's proposed findings became part of the record. It simply sat idly by.

¶24. Thus, through the State's inaction, we are left with a serious appellate issue that has no support in the record. Consequently, because there is no record evidence to support this allegation, our precedent demands we find this issue to be without merit.

## II. No "Malingering Test"

¶25. The State's first two appellate issues center on the fact Dr. Zimmerman never administered a test specifically designed to detect malingering.[12] According to the State, Dr. Zimmerman's failure to give a "malingering test" ignored our mandate in *Scott II* and also fell short of meeting *Chase*'s requirements.

### A. *Scott II*'s Overruling

¶26. The State concedes the requirement that Scott take the MMPI-II was overruled by *Lynch*. But it still insists Scott had to undergo some sort of malingering test to comply with *Scott II*. However, our mandate in *Scott II* was based on a specific point of law—"The MMPI-II test is required prior to adjudication on a claim of mental retardation pursuant to *Atkins* and *Chase*." *Scott II*, 938 So. 2d at 1233. And that specific point of law was expressly overruled. *Lynch*, 951 So. 2d at 557. With that overruling went the requirement that Scott had to obtain *any* further testing before his *Atkins* hearing.

### B. *Chase*'s Requirements

¶27. With *Scott II*'s additional MMPI-II requirement overruled, Scott had the same burden as any other *Atkins* claimant in Mississippi. In *Chase*, we held—

> [N]o defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who

---

[12] Malingering is the "intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs." *Foster*, 848 So. 2d at 175 (Miss. 2003); *see also Scott II*, 878 So. 2d at 946 (defining malingering as "grossly exaggerating or fabricating information" for reasons including "avoiding arrest or evading prosecution and incarceration"). In the death-penalty context, malingering has been described as the "deliberate feigning of [intellectual disability] in order to avoid the death penalty." *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1302 (N.D. Ala. 2009).

expresses an opinion, to a reasonable degree of certainty, that:

1.  The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;[13]

2.  The defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

*Chase*, 873 So. 2d at 1029.

¶28.    According to the State, to meet *Chase*'s second prong, Dr. Zimmerman had to administer a test specifically designed to detect malingering—simply administering two different IQ tests and comparing the results could not suffice.

¶29.    We disagree.    As this court previously clarified in *Lynch*, there is no mandate of specific testing to meet *Chase*'s requirements.  *Lynch*, 951 So. 2d at 556-57.  Instead, Scott could rely on "any other tests *and procedures* permitted under the Mississippi Rules of Evidence, and deemed necessary to assist the expert and the trial court in forming an opinion as to whether the defendant is malingering." *Chase*, 873 So. 2d at 1028 n.19 (emphasis added).

¶30.    Here, both Scott's expert and the State's expert did agree on one thing.  Both claimed

---

[13] In 2004, we adopted both the American Association on Mental Retardation (AAMR)'s and the American Psychiatric Association (APA)'s then-current definitions of "mental retardation."  *Chase*, 873 So. 2d at 1027-28.  A decade later, we updated the term "mental retardation" to "intellectual disability" and adopted the latest definitions by AAMR, now the American Association for Intellectual and Developmental Disability (AAIDD) and the APA. *Chase III*, 171 So. 3d at 469-70.  "The new AAIDD and APA definitions are similar and require the same three basic elements of intellectual disability as the earlier definitions: significantly subaverage intellectual functioning, significant deficits in adaptive behavior, and manifestation before age eighteen." *Id.*

no malingering test has been "normed" for the intellectually disabled. For this reason, Dr. Zimmerman administered *no* malingering tests, instead finding consistency across different IQ tests ruled out malingering. By contrast, Dr. Storer administered *four* malingering tests, finding consistency across different malingering tests indicated malingering. "Neither side's methodology, approach, or understanding of the issue is infallible." **Doss**, 19 So. 3d at 714. So long as the expert opinion about malingering is admissible under our Rules of Evidence, the chosen method for reaching that conclusion goes to the *weight and credibility* of the expert opinion, not its sufficiency to meet **Chase**'s requirement. *See **Chase***, 873 So. 2d at 1028 n.19; *see also **Phillips v. State***, 984 So. 2d 503, 510 (Fla. 2008) (deferring to the trial court's determination that the state's expert, who testified the defendant was malingering, was more credible than the defendant's expert, who did not test the defendant for malingering).

### C.    Mississippi Rule of Evidence 702

¶31.    This brings us to the State's alternative argument that Dr. Zimmerman's expert opinion that Scott was not malingering was inadmissible under Rule 702 because the back-to-back-IQ-test procedure does not find support within the forensic-psychology community. *See* M.R.E. 702.

¶32.    Under Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles

13

and methods reliably to the facts of the case.

Essentially, the State is arguing Dr. Zimmerman's testimony about malingering does not meet the second prong because it is not the product of reliable principles and methods.

¶33. But at the *Atkins* hearing, Scott presented evidence the forensic-psychology community has accepted Dr. Zimmerman's method—namely, the article by Dr. Macvaugh and Dr. Cunningham. In addressing the suggestion no malingering test has been normed for the intellectually disabled, Dr. Macvaugh and Dr. Cunningham opined that assessing suboptimum effort is "greatly assisted by the presence of intellectual assessment results that predate the capital charge. The stability of results from repeated intellectual assessments that are separated by years . . . is also of inferential benefit." Macvaugh & Cunningham, *supra* at 173. While admittedly not aware of any "longitudinal research investigating this premise," in their view "it would seem to be a task of improbable complexity to 'dial in' a performance consistent with mild mental retardation on multiple test administrations separated by years, particularly when different instruments have been employed." *Id.*

¶34. The State argues Dr. Zimmerman's back-to-back IQ testing did not put into practice the article's theory that it would be difficult to fake consistent scores on different tests "separated by years." But Dr. Zimmerman did not rely solely on back-to-back tests. In line with the article, Dr. Zimmerman compared Scott's scores on the two IQ tests he had administered in 2005 with Scott's scores on four prior IQ tests administered years earlier, two of which were administered before he committed the capital crime, all of which yielded

14

scores in the intellectually disabled range.[14]

¶35.    Admission of expert testimony is within the sound discretion of the trial court. **Bishop v. State**, 982 So. 2d 371, 380 (Miss. 2008).  And here, the trial court considered Dr. Macvaugh and Dr. Cunningham's article when ultimately ruling Dr. Zimmerman's opinion on malingering was reliable.  Given our deferential standard of review, we find no reversible error in admitting Dr. Zimmerman's expert opinion that Scott's multiple consistent IQ scores in the intellectually disabled range ruled out the possibility of malingering.[15]

### III.    Additional Expert

---

[14] Scott first was tested in 1992, when he applied for Social Security disability benefits.  He scored a 48.  A year later, Farris administered the WISC as part of the comprehensive assessment by Scott's school.  Scott obtained a full-scale score of 68.  And after he was arrested, Scott took the WAIS-III twice in 1997.  The State's expert, Dr. Criss Lott, assessed Scott a full-scale score of 73.  And Scott's expert, Dr. Mulry Tetlow, gave Scott a full-scale score of 60.  In **Chase**, this Court adopted the American Psychiatric Association's view "that 'mild' mental retardation is typically used to describe persons with an IQ level of 50-55 to approximately 70," though "mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75." **Chase**, 873 So. 2d at 1028.

[15] Other jurisdictions have relied on this comparative method to rule out malingering. *E.g.,* **Brumfield v. Cain**, 808 F.3d 1041, 1060 (5th Cir. 2015) (rejecting Louisiana's argument that the defendant's low IQ scores were the result of "low effort" in part because the defendant's expert testified the defendant's "consistent scores across multiple tests over multiple years ruled out malingering"); **U.S. v. Nelson**, 419 F. Supp. 2d 891, 902 (E.D. La. 2006) (finding the "most compelling argument against the possibility of malingering in this case is the overwhelming consistency among all the intelligence testing"); **Black v. State**, 2005 WL 2662577, at *5 (Tenn. Crim. App. Oct. 19, 2005) (unreported) (noting the defendant's expert saw no evidence of malingering, even though he did not specifically test for it, because "he administered a battery of tests, which would in effect rule out malingering because it's difficult to perform poorly on the same concept on various tests"); *see also* **Hall v. Florida**, 134 S. Ct. 1986, 2011, 188 L. Ed. 2d 1007 (2014) (Alito, J., dissenting) (dissenting in part based on the "well-accepted view . . . that multiple consistent scores establish a much higher degree of confidence" that the score is an accurate reflection of the defendant's actual intellectual ability").

¶36. In addition to challenging the admissibility of Dr. Zimmerman's expert testimony, the State also argues the trial judge erred by permitting school psychologist Gussie Farris to testify.

¶37. According to the State, "*Chase* requires a 'licensed psychologist[,]' which Farris is not." Instead, Farris is a masters-level school psychologist for the Coahoma County School District, licensed through the Mississippi Department of Education, with more than thirty years' experience in special education and administration of IQ tests.

¶38. The State is correct that *Chase* requires an expert opinion from "a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing [intellectual disability], and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining [intellectual disability]." *Chase*, 873 So. 2d at 1029. But "[u]pon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence." *Id.* In other words, while *Chase* requires the expert opinion of at least one licensed psychologist, it does not restrict expert testimony to licensed psychologists only. Instead, so long as Farris properly qualified as an expert under Mississippi Rule of Evidence 702, she could give an expert opinion at Scott's hearing. *Chase*, 873 So. 2d at 1029.

¶39. Again, we point out the admission of expert testimony is within the sound discretion of the trial court. *Bishop*, 982 So. 2d at 380. To be admissible, "[e]xpert testimony must be relevant and reliable." *Bateman v. State*, 125 So. 3d 616, 625 (Miss. 2013). And here,

Farris's testimony was both. Her testimony of Scott's 1993 assessment and school records was relevant. And her education and experience supported the trial judge's finding that her expert testimony was reliable. Thus, the trial judge did not abuse his discretion when he admitted Farris as an expert.

¶40. Still, the State challenges Farris's reliability, arguing she made statements during cross-examination that showed she was biased. But concerns of bias go to the weight and credibility of Farris's testimony, not its admissibility. And the trial judge—not this court—is the "sole authority for determining credibility of the witnesses." *Doss*, 19 So. 3d at 694 (quoting *Loden v. State*, 971 So. 2d 548, 572-573 (Miss. 2007)). The trial judge found Farris's testimony to be credible. Our standard of review requires we defer to his credibility determination.

### IV. Opposing Experts

¶41. In its first two issues, the State challenged the legal sufficiency and admissibility of Dr. Zimmerman's expert testimony, based on his underlying methodology. In its fourth issue, the State challenges the weight the trial judge afforded Dr. Zimmerman's expert testimony that Scott met all three criteria of intellectual disability. Essentially, the State argues the trial judge picked the wrong expert. Instead of relying on Dr. Zimmerman's opinion to support a holding of intellectual disability, the State suggests the trial judge should have believed the view of its expert, Dr. Storer, who found Scott was malingering.

¶42. But our legal role as a reviewing court is not to second-guess whether Dr. Storer's opinion that Scott was malingering was more credible than Dr. Zimmerman's opinion that

Scott was intellectually disabled. Instead, in cases like this one, where "we have . . . experts who take opposite positions as to whether" Scott is intellectually disabled, Mississippi law requires we defer to the trial judge, who "sits as the trier of fact and assesses the totality of the evidence as well as the credibility of witnesses." *Doss*, 19 So. 3d at 714. Only when a trial judge's finding on intellectual disability is "clearly erroneous" may we disturb it. *Goodin v. State*, 102 So. 3d 1102, 1111 (Miss. 2012). But the mere likelihood we would not have bought a particular expert's view or would have ruled differently than the trial judge does not amount to clear error. *Booker v. State*, 5 So. 3d 356, 358 n.2 (Miss. 2008) (citing *Easley v. Cromartie*, 532 U.S. 234, 242, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001)).

¶43.	Here, the trial judge was faced with battling experts. Scott's consisted of a licensed forensic psychologist and a school psychologist who both testified Scott was intellectually disabled. And the State offered a licensed psychology expert who testified he could not reach a reasonable degree of certainty about the issue. After hearing from all experts, the judge found Dr. Zimmerman's and Farris's testimony to be more credible. This finding is entitled to deference. *See Doss*, 19 So. 3d at 714; *see also Phillips*, 984 So. 2d at 510 ("Although Phillips challenges the trial court's credibility finding, we give deference to the court's evaluation of the expert opinions.").

¶44.	Further, this finding was supported by lay testimony of Scott's mother and special-education teacher, Scott's school records, and the fact he had received social security disability benefits as a teenager based on "severe mental retardation." Therefore, we do not disturb the trial judge's finding of intellectual disability on appeal.

**Conclusion**

¶45.    Finding no reversible error supported by the record, we affirm the trial court's judgment vacating Scott's death sentence.  While Scott may not be executed due to his intellectual disability, "mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes."  *See Atkins*, 536 U.S. at 306, 122 S. Ct. at 2244, 153 L. Ed. 2d 335.  So Scott still must be punished for capital murder.  As he has yet to be resentenced, we remand this case to the Bolivar County Circuit Court for resentencing.[16]

¶46.    **AFFIRMED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR.**

---

[16] At the time Scott murdered Lee in November 1995, Mississippi Code Section 99-19-101(2)(d) (Rev. 1994) provided—as it still does today—three sentencing options for capital murder—life, life without the eligibility of parole, and death.  *Cf.* Miss. Code Ann. § 99-19-101(2)(d) (Rev. 2015).  But a year prior to the murder, the Legislature amended Mississippi Code Section 47-7-3, the parole-eligibility statute, to remove parole eligibility for capital murder.  Instead, "[n]o person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101[.]" 1994 Miss. Laws First Exec. Sess. ch. 25, § 5 (S.B. 2003) (currently codified as Miss. Code Ann. § 47-7-3(1)(e) (Rev. 2015)).  Reading Section 99-19-101 together with Section 47-7-3, this Court has found there are only two sentencing options for capital murder—"death or life imprisonment without the eligibility of parole."  *Flowers v. State*, 842 So. 2d 531, 557 (Miss. 2003).  With Scott's death sentence vacated as unconstitutional due to his intellectual disability, only one available sentencing option is left—life without the eligibility of parole.